**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**COVINGTON DIVISION**
**CASE NO. 2:17-cv-76-WOB-CJS**

**HOLLY SCHULKERS, et. al.**                                      **Plaintiffs**

**vs.**

**ELIZABETH KAMMER, et. al.**                              **Defendants**

_____

### PLAINTIFFS' SECOND AMENDED COMPLAINT

Come now all Plaintiffs as set forth above, by and through counsel, and for their Complaint against all Defendants state as follows:

### JURISDICTIONAL ALLEGATIONS

1.      The entirety of the events set forth in this Complaint took place in the county of Kenton, Commonwealth of Kentucky, within the jurisdictional boundaries of this Court.

2.      The Plaintiffs are a "blended" family. Plaintiff Holly Schulkers (hereinafter Holly) and Plaintiff David Schulkers (hereinafter David) are married.

3.      Holly is the biological mother of Plaintiffs BRB, BOB, and Baby AMS and stepmother to David's children, Plaintiffs EES and EMS.

4.      David is the biological father of Plaintiffs EES, EMS, and Baby AMS and stepfather to Plaintiffs BRB and BOB.

5.      Defendant Elizabeth Kammer (hereinafter Kammer) is, and was at all times relevant hereto, an individual citizen and resident of the State of Kentucky, and a Social Worker employed by the state of Kentucky with the Kentucky Cabinet for Health and Family Services (hereinafter Cabinet).

1

6.      Defendant Alison Campbell (hereinafter Campbell) is, and was at all times relevant hereto, an individual citizen, resident of the State of Kentucky and Social Worker employed by the Cabinet and upon information and belief, during all times relevant hereto, Kammer's Supervisor or Manager within the Cabinet.

7.      Defendant Jane Doe Kara X (hereinafter Kara) is, and was at all times relevant hereto, an individual and citizen and resident of the State of Kentucky and a Social Worker employed by the Cabinet.

8.       Defendant Ann Marie Davis (hereinafter Davis) is a "Care Coordinator" and is employed by St. Elizabeth Hospital and worked in concert with and at the direction of the Cabinet at all times relevant hereto.  Davis acted as an agent for the Cabinet while employed by St. Elizabeth Hospital and enabled the Cabinet to enforce unconstitutional restrictions and limitations upon Plaintiffs.

9.      Defendant Deborah Cinque (hereinafter Cinque) is, and was at all times relevant hereto, an individual employed as a Nurse by St. Elizabeth Hospital (hereinafter St. E) and performed her duties at all times relevant hereto at St. E in Edgewood, Kenton County, Ky.

10.      Defendant St. E is a licensed private facility approved by the State of Kentucky to provide medical services.

11.       This action is filed pursuant to 42 U.S.C. Section 1983 to redress injuries suffered by each Plaintiff for deprivation, under color of state law, of rights secured by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction pursuant to 28 U.S.C. Section 1367 and

2

supplemental jurisdiction of the state law claims pursuant to 28 U.S.C. Section 1367.

12.    Venue in the United States District Court, Eastern District of Kentucky, Northern Division, is proper pursuant to 28 U.S.C. Section 1931 in that the conduct and injuries about which Plaintiff complains occurred within the venue of this Court.

## FACTUAL ALLEGATIONS

13.    Plaintiffs hereby reaffirm, reiterate, and incorporate by reference each and every allegation previously set forth within this Complaint as if fully recited herein and further states as follows:

### BIRTH OF AMS, ST. ELIZABETH, AND THE CABINET (2/8/17-2/10/17)

14.    On February 8, 2017 Holly was admitted to St. E in Edgewood Kentucky for a scheduled induction at 38 weeks, 4 days pregnant. On xx/xx, 2017 she gave birth to Baby AMS without incident. Baby AMS was 7 lbs., 20 inches long, and scored 9/10 on the Apgars test. Holly breastfed Baby AMS within the first hour of her birth, and, with full knowledge of St. E personnel, continued breastfeeding until Baby AMS was discharged on February 12, 2017.

15.    At approximately 8:00 a.m. on February 10, 2017, while Holly was in the shower, Baby AMS's Pediatrician, Dr. Ebru Gultekin, examined Baby AMS and advised David the plan was to discharge Holly and Baby AMS later that afternoon

16.    Shortly after Dr. Gultekin left the room, Holly exited from the shower to find Social Worker Davis in her room. Davis identified herself as a hospital

3

employee and claimed Holly had tested positive for Opiates. She asked Holly if she was taking any medications. Holly responded that she was on medication for high blood pressure, used over the counter heartburn medication, and had recently taken her daughters cough syrup. Davis indicated none of the medications would cause a positive drug test, Baby AMS's umbilical cord was drug tested, and, depending on the results, the Cabinet might be called.

17.     Holly was never told her blood or urine had been tested for drugs and she did not consent to the release of any results to the Cabinet.

18.     Davis left the room and told Holly and David if they had any questions they could page her.

19.     Very shortly after Davis left, Holly and David had her paged. They asked Davis if Holly's consumption, shortly before admission, of "Stacey's Everything Bagel Chips", which contained poppy seeds, could have caused a false positive. Davis said it could not and left.

20.     David and Holly asked to speak with someone in charge. At approximately 5 pm on February 10, 2017, Holly spoke with Nurse Manager Cinque. Holly told Cinque that Dr. Gultekin planned to release Baby AMS that afternoon. Cinque phoned Dr. Gultekin and handed Holly the phone. Dr. Gultekin told Holly she would try and get Baby AMS discharged as soon as she could. When Holly relayed this information to Cinque, she claimed Dr. Gultekin could not discharge Baby AMS because St. E's policy required that she be observed for 72 hours for symptoms of withdrawal.

4

21.     In response to hearing Baby AMS would not be released with her, Holly became upset. Cinque told her she could stay with Baby AMS even after Holly was discharged, that none of the nurses believed Holly was a drug addict and she could continue breastfeeding Baby AMS during the 72 hour observation period.

22.     Despite not believing Holly was using illicit drugs, Cinque and St. E denied Plaintiffs repeated requests to take their child home based on "hospital policy." Although David and Holly were told the 72 hour hold began at 5 pm on February 10th, the first neonatal abstinence score for Baby AMS was not recorded until February 11th at 10 a.m. and the score was 0.

23.     Upon information and belief, St. E's has a policy of conducting a confirming test after a presumptively positive drug test and then will test the umbilical cord for ultimate confirmation of drug issues during a birth.

24.     Upon information and belief, St. E's policy is not to contact the Cabinet until such confirming tests are conducted in order to avoid wrongful allegations of drug abuse by a new mother.

25.     Despite such policies, Davis notified the Cabinet of the positive presumptive test sometime on February 10, 2017.

26.     The report was made thirty-eight hours (38) after the "presumptive positive" result was charted and twenty (20) hours after Baby AMS was born.

27.     The "presumptive positive" toxicology result contained a clear disclaimer that it "should not be used for non-medical purposes."

28.     St. Elizabeth did not run a "Drug of Abuse with Reflex to Confirmation" on Holly's first urine sample.

29.     On February 10, 2017, at 9 a.m., Davis charted that Holly had a positive drug screen and falsely indicated she had a "substance abuse disorder."

30.     Defendant Davis was not required to report the "presumptive positive" drug result because there was no "reasonable cause" to believe there was abuse or any pattern of conduct that rendered Holly incapable of caring for the immediate ongoing needs of Baby AMS.

31.     Holly was permitted to breastfed her baby and was charted as "bonding well" before and after St. Elizabeth reported the "presumptive positive" drug test.

32.     Defendant Davis's screening for alcohol or substance dependency or abuse indicated Holly's prenatal labs were "negative", she had no history of drug use, and would need no drug treatment after delivery.

33.     St. Elizabeth administered the toxicology test before Baby AMS was born and Holly was never informed a toxicology test was performed on her or Baby AMS.

34.     The toxicology test was performed on Baby AMS despite that the attending physician did not have reason to believe, based on a medical assessment of Holly or Baby AMS that Holly had used a controlled substance or substance identified by the Cabinet for a non-purpose during the pregnancy.

35.    At approximately 5:00 p.m. on Friday, February 10, 2017, Social Workers Kammer and Kara entered Holly's room. Holly was told she had tested positive for heroin. Kammer asked for her children's names, where they went to school, and about her "drug abuse." Holly insisted there was an error with the test because she did not use drugs, worked at a child care center, was her son's basketball coach, and volunteered in the school cafeteria.

36.    Kammer asked Holly to take another drug test, Holly agreed, and her urine was taken at 7:55 p.m.

37.     While speaking with Holly, Kammer put Supervisor Campbell on speaker phone. Campbell asked Holly: "How did the Heroin get into your system?" and "Let me get the help you need so you can be a better mother to your children". When Holly insisted she did not do drugs and the test was a mistake, Campbell threatened: "Well, until this gets figured out you are no longer allowed to be around any children without the supervision of approved individuals".

38.    At the time Campbell imposed this restriction, the umbilical cord and 2nd drug test results were still pending.

39.    At the time Campbell imposed this restriction there was no Court Order authorizing the restriction and since the statement was made no Order has been sought.

40.    While the umbilical cord and 2nd drug test results were still pending, after consulting with Campbell, Kammer presented Holly with a "Prevention Plan". She explained if Holly failed to follow the "Prevention Plan" all of the children in

her house would be removed **and after that** the Cabinet would seek Court intervention. At the bottom of the Prevention Plan was a stamp which forebodingly stated, in all capital letters, "...**PLACEMENT IN FOSTER CARE IS THE PLANNED ARRANGEMENT FOR THIS CHILD**".

41.    The "Prevention Plan", in relevant part, required: "Holly will have supervised contact with all children by approved supervisors until notified by CHFS. Supervision means eye & ear shot at all times (24/7)". Kammer explained: if the supervisor steps out of the room, Holly has to follow and if the supervisor has to go to the bathroom Holly has to remove herself until the supervisor returns." Kammer said if any restrictions were violated the children would "be removed."

42.    Under the coercive conditions set forth above, less than 30 hours after giving birth, while being forced to remain in the hospital so their baby could be "observed", and under the threat that their children would be "removed from their care", without a hint of "voluntariness" and under duress, Holly and Dave signed the "Prevention Plan" as did Kammer.

43.    Holly's "night Nurse", Lauren D., questioned the Prevention Plan. She pointed out the baby was clearly healthy, the nursing staff and doctors believed the test to be a false positive, in the past women with open cases were allowed to leave with their babies, and that she had seen a number of "presumptive" positive tests on expectant mothers but the Cabinet did not get involved until after the test was confirmed with the umbilical cord. In response, Kara took Lauren into the hallway

and told her: "We **are supposed to be working as a team,** why are you pitting them against me?"

44.     Kara and Kammer interviewed David and Mary Schulkers (Holly's mother in law). They asked David: "How long has your wife been on drugs?" After running background checks on Mary and David, Kammer approved them as "supervisors" for Holly. Neither Mary nor David was required to submit to a drug test.

45.     After Kammer and Kara left, Lauren talked to St. E's lab and told Holly and David that St. E's uses a lower threshold level for a positive result than the required Federal Government regulations

46.     On February 10, 2017, at 8 p.m., shortly after Kammer and Kara left, Holly's drug test came back as negative for any drugs. Lauren D. left a voicemail for Kammer. However, St. E. and Cinque continued to deny requests to release Baby AMS.

**FALSE POSITIVE TEST REVEALED; TO NO AVAIL (2/10/17-2/11/17)**

47.     Between 5:00 and 6:00 a.m. on February 11, 2017, Dr. James Otrembiak came to check on AMS. He told Holly he had received a call from a Social Worker on Friday afternoon claiming Holly had tested positive for drugs but that he told the Social Worker the test had to be wrong. He also told Holly eating poppy seed chips could cause a false positive.

48.     On Saturday, February 11, 2017 at 1:32 p.m., St. E. received the umbilical cord results, which were negative for drugs. At 1:52 p.m. hospital Social

Worker McCann emailed the negative urine and umbilical cord test results to Kammer At 3:45 p.m. Kammer confirmed to Holly she had received both.

49.    As of 3:45 p.m., on Saturday, February 11, 2017, Cinque, Kammer, and St. E's had specific knowledge that:

a.    The medical professionals for Holly and Baby AMS professed Baby AMS was completely healthy and believed the pre-delivery presumptive positive test result was a false positive, evidenced by the fact Holly was permitted to breast feed immediately after birth and continued through the discharge of Baby AMS.

b.    The result of Holly's second (and more specific) "confirming" urine test was negative for drugs;

c.    The result of the umbilical test (by far the most accurate and determinative test given) was also negative for drugs; and

d.    There was no Court Order nor any petition filed with any Court in order to justify further sanctioning or restricting the Plaintiffs.

50.    Subsequent to 3:45 p.m. on February 11, 2017, each single imposition, restriction, Constitutional violation, and violation of the protections afforded to the Plaintiffs under state and Federal law and/or the continuance of the same upon the Plaintiffs was conducted in complete and absolute Bad Faith by all Defendants as listed herein.

51.    Subsequent to 3:45 p.m. on February 11, 2017, any "investigation" conducted or initiated by any Defendant  was in Bad Faith, was not supported by

the facts or the law, was in violation of the Cabinet's own policies because all Defendants were aware there was no reasonable cause to believe there was any abuse or neglect pursuant to KRS 620(1)(a), and was solely calculated to harass and annoy the Plaintiffs and interfere with the Plaintiff's Constitutional Fundamental Right to Family Integrity.

52.    After both the "confirming" drug test and the umbilical came back negative for drugs, Holly and David repeatedly requested Baby AMS be released from the hospital.  All requests were refused.

53.    Baby AMS was finally released from St. E's on Sunday, February 12, 2017 at 11:00 a.m.

### CAMBPELL AND KAMMER CONTINUE THEIR "INVESTIGATION"

54.    On Monday, February 13, 2017, David was forced to stay home from work due to the "Prevention Plan" to "supervise" Holly around the children. At 9:00 a.m. Holly called Kammer and asked again to be released from the plan. Kammer told Holly she had to talk to Campbell because she did not know how to proceed in the face of a false positive on a drug test. Campbell refused to release the restrictions of the plan.

55.    Later that day, Holly contacted attorney Rene Heinrich who advised her to take another drug test, which was also negative.

56.    On Monday, February 13, 2017, Kammer and an unidentified Social Worker went to Johnson Elementary school to interview BRB, BOB, EMS and then to Highlands Middle School to interview EES. Under the full force and authority of

the state of Kentucky, under the color of state law, in complete Bad Faith, and without reasonable or probable cause that the children were "neglected" or "abused" in any way, Kammer and the other Social Worker required school staff to remove the children from their classroom for interviews. Holly and Dave were unaware of the interviews and would not have granted permission.

57.     One by one, the school staff had the children removed from their classroom, and brought them into a room with the two Social Workers, who were strangers to the children. School personnel were not permitted to sit with the children during the interview. The children were questioned about "mommy using drugs", alcohol use, and whether there was arguing or physical violence in the house. The children did not believe they were, nor were they, free to leave the room until they were released by the Social Workers.

58.     The children returned home that afternoon terrified and crying. They were afraid of being "taken away" and wanted to know if Mommy or Daddy was going to jail. The childrens' sense of safety within the family that each possessed when school started on Monday, February 13, 2017 was severely damaged if not destroyed by the time they went home that day.

59.     Holly and David had to phone their respective ex- spouses to explain what had happened to the children.

60.     On some date subsequent to February 13, 2017, Kammer or Campbell contacted David's ex-wife and requested the children's immunization records.

61.     Because Kammer had conclusive evidence that there was no neglect or abuse of any child, she and the other Social Worker lacked authority to interview the children and therefore the interviews constituted an unreasonable seizure under the 4th Amendment to the United States Constitution and the Section 10 of the Kentucky Constitution.

62.     Because there was no reasonable basis to believe any child had been abused or neglected, Kammer and the other Social Worker lacked authority, pursuant to KAR 922:1:330 and KRS 620.030, to interview the children because such authority is limited to situations in which the Cabinet is in "receipt of a report of child abuse or neglect".

63.     The Cabinet, and Kammer, possessed, prior to the interviews, clear and unequivocal evidence that there was no abuse or neglect of any of the children. As such, the interviews were conducted in Bad Faith and were violative of each of the Federal and State protections as set forth herein.

64.     From February 12, 2017 through February 21, 2017, Plaintiffs family life was completely disrupted. David had to take time off work, Holly had to take her newborn and 3 year old to her mother in law's house, or Holly's mother in law had to come to her house to "supervise" Holly with her own children. Holly lived in fear that her doorbell would ring and Social Workers would take her children away.

65.     On Thursday, February, 16, 2017, at her counsel's request, Holly took a hair follicle drug test to negate the possibility of any long term drug use. The test was negative and was e-mailed to Campbell and Kammer on February 21, 2017

66.     On February 21, 2017, Holly's attorney e-mailed Campbell, Kammer, and other Cabinet staff to notify them Plaintiffs would no longer follow the Prevention Plan and that any further action must proceed through Court. Heinrich had previously requested, on multiple occasions, that Campbell and/or Kammer issue a finding of unsubstantiated given the uncontroverted evidence that there was no drug abuse. Each request was denied with no explanation.

67.     Even after Plaintiffs' counsel notified the Cabinet that Plaintiffs would no longer follow the Prevention Plan, and after the Cabinet received uncontroverted evidence that there was no abuse or neglect, the Cabinet would not void the Prevention Plan. Plaintiffs lived in fear the Cabinet would take their children (as they promised to do) for their failure to follow the Prevention Plan.

68.     Despite the overwhelming evidence that none of the children had been neglected or abused and that Holly was not a drug user, the Cabinet continued its investigation. At some point, during the week of March 17-March 21, 2017, Kammer contacted David's ex-wife (mother of EES and EMS), Jennifer Ritter. This created a major disruption to Plaintiffs; family.

69.     Despite repeated requests by Heinrich and by Holly, specifically on March 29, 2017, the Cabinet refused to close the "investigation" and it remained open until April 7, 2017, at which time the case was finally labeled "unsubstantiated abuse" in a letter from Campbell.

## IS IT ALL ABOUT THE MONEY?

70.     Pursuant to Title IV-E, 42 U.S.C. 672, states can receive reimbursement of its administrative costs expended on behalf of children who are receiving services within their own home when those services are being provided to prevent removal from the home. The costs of an "investigation" are included for such reimbursement. To qualify for this funding, the Cabinet must provide the federal government documentation that there is a "defined **Prevention Plan"** which clearly states: **"ABSENT EFFECTIVE PREVENTATIVE SERVICES, FOSTER CARE IS THE PLANNED ARRANGEMENT FOR THE CHILD".** (Emphasis added) (472 (i)(2) of the Social Security Act).

71.     Additionally, "should the state determine that the child is no longer a candidate for foster care at any point prior to the removal of the child from the home, subsequent activities will not be allowable for reimbursement of costs under Title IV-E.

72.     Upon information and belief, Plaintiffs believe the Title IV-E funds motivated the initiation, continuing investigation, and Campbell, Kammer, and the Cabinet's refusal to terminate the investigation.

73.     Plaintiff must be afforded discovery prior to any dispositive motions being ruled upon to obtain this evidence which is exclusively under the control of the Defendants and is not subject to disclosure under any open records request.

### COUNT I: VIOLATION OF PROCEDURAL AND SUBSTANTIVE DUE PROCESS AS TO PLAINTIFFS' CONSTITUTIONAL RIGHT TO FAMILY INTEGRITY 42 U.S.C SECTION 1983

74.     Plaintiffs hereby reaffirm, reiterate, and incorporate by reference each and every allegation previously alleged within the Complaint as if fully recited herein and further states as follows:

75.     Plaintiffs, as citizens of the United States of America and the Commonwealth of Kentucky, are accorded many rights, freedoms, and benefits under the United States Constitution and the Constitution of Kentucky.

76.     Within those constitutional rights enjoyed by Plaintiffs are, *inter alia*, the right to Family Integrity and the right to be free to raise their family without government intervention absent due process of law.

77.     The Shulkers interest in the care custody, and control of their children is a fundamental familial liberty interest under the United States Constitution.

78.     Defendants Campbell and Kammer, acting under the color of state law and without Court authority, intentionally, willfully, wantonly, grossly and in complete bad faith and without reasonable cause violated Plaintiffs' constitutional rights under the Fourteenth Amendment to Familial Relations and to due process of law by:

a)     Coercing the Schulkers to sign a Prevention Plan, requiring Holly to be supervised twenty four (24) hours a day with her children, using a "presumptive positive" result for opioids, falsely claiming it reflected Holly had tested positive for heroin and that her children would be placed in foster care if the Schulkers did not agree to the plan, when the state had no authority to take such action.

(b)     After coercing the Prevention Plan, continuing to require Holly be supervised pursuant to the Prevention Plan from February 10, 2017 through April 7, 2017; after a subsequent negative urine and umbilical cord result.

c)     Unlawfully seizing and interviewing (and for Campbell supervising and/or authorizing the seizure and interviews) Plaintiffs' children at school in violation of KRS 620:030 and KAR 922:1:130 when Campbell and Kammer had no valid report of child abuse or neglect and had actual evidence to the contrary.

d)     Interviewing David's ex-wife when Campbell and Kammer had no valid report of child abuse or neglect and had actual evidence to the contrary.

e)     Repeatedly refusing to issue an "unsubstantiated" abuse report which resulted in the disruption of Plaintiffs' family integrity and forcing Plaintiffs' to leave in fear that their children would be taken.

f)     Imposing all these restrictions without due process of law.

79.     Upon information and belief, Plaintiffs' rights were violated by Kammer and Campbell so the Cabinet and/or State could acquire Federal funding as set forth herein.

80.     Assuming the Cabinet obtained federal funding for the investigation, Kammer and Campbell have defrauded the U.S. government so as to benefit their employer, the Cabinet. Such fraud was committed in bad faith and at the financial expense of U.S. citizen taxpayers and at the emotional expense of the Schulkers family.

81. Plaintiffs' fundamental right to family integrity without unreasonable government intervention is clearly established. It is unlawful for Social Workers to violate a family's peace and well-being absent evidence of abuse and neglect of children. It is unlawful, and contrary to Kentucky statutes listed herein and to the Cabinet's own policy and procedures, for Social Workers, after receiving conclusive evidence that there is no abuse and/or neglect, to continue to threaten and harass a family.

82. The State's policy of coercing parents who have tested "presumptively positive" for opioids, to sign a Prevention Plan requiring the parent be supervised with their children twenty four hours a day, by threatening to put children in foster care if they don't agree to the plan, when the state had no authority to take such an action, unreasonably infringes upon the fundamental familial liberty interests of the Shulkers such that their substantive due process rights were violated.

83. St. Elizabeth, through its agents, acting under the color of state law and in concert with the Cabinet, intentionally, willfully, wantonly, grossly and in complete bad faith violated Plaintiffs' constitutional rights under the Fourteenth Amendment to Familial Relations and to due process of law by;

(a) Instituting a Cabinet investigation, based on an initial "presumptive positive" drug test result, upon which no confirmation was performed, with the knowledge Holly Schulkers prenatal screens were negative and that Baby AMS's Pediatrician believed the ingestion of cough medicine or poppy seeds had caused the

18

false positive and had "no social issues or concerns in the past" with regard to the Schulkers other children.

(b)     Instituting a Cabinet investigation based on the false representation that Holly Schulkers had a "substance abuse disorder" and that Baby Schulkers was neglected or abused.

(c)     Refusing to release Baby AMS based on an initial "presumptive positive" drug test result, upon which no confirmation was performed, with knowledge that Holly's prenatal screens were negative, after receiving a subsequent negative results from Holly's second urine test and Baby AMS's umbilical cord results, and with the knowledge Baby AMS's Pediatrician recommended discharging Baby AMS as a normal newborn with normal newborn care, believing the ingestion of cough medicine or poppy seeds had caused the false positive;

(d)     Imposing supervision restrictions on Holly while she was in St. Elizabeth, which restrictions were incorporated into the conditions of her discharge pursuant to a CAPTA "Plan of Care."

84.     St. Elizabeth acted, through its agents, under color of state law pursuant to a delegation of authority by the Commonwealth of Kentucky, pursuant to KRS 214.160(4), of powers traditionally delegated to the state, specifically to determine whether abuse or neglect has occurred and whether a Cabinet investigation is warranted.

85.     The Cabinet accepted St. Elizabeth's report as a finding that abuse or neglect occurred and that an investigation was required.

86.     As a direct and proximate cause of Defendants' conduct, Plaintiffs were deprived of their fundamental right of Familial Relations, Family Integrity, have and will continue to suffer extreme emotional and psychological stress and damage.

**COUNT II: VIOLATION OF PROCEDURAL AND SUBSTANTIVE DUE PROCESS AS TO PLAINTIFFS' FUNDAMENTAL CONSTITUTIONAL RIGHT TO FAMILY INTEGRITY and AMS' FOURTH AMENDMENT RIGHT TO BE FREE FROM SEIZURE OF HER PERSON VIOLATION OF 42 U.S.C SECTION 1983 AND PARALLEL STATE RIGHTS**

87.     The Plaintiffs hereby reaffirm, reiterate, and incorporate by reference each and every allegation contained within this Complaint as if fully recited herein and further states as follows.

88.     St. Elizabeth and its agents acted under color of state law, as a willful participant, in joint activity with the State and the other named Defendants to effectuate the deprivation of the Schulkers' constitutional rights.

89.     St. Elizabeth's Social Workers were authorized by the Cabinet to provide answers to the Schulkers regarding the "Plan of Care", the "Prevention Plan" and investigation.

90.     The Commonwealth of Kentucky delegates to St. Elizabeth the duty under CAPTA to create a Plan of Safe Care as part of discharge planning and the Cabinet incorporates that plan into any Prevention Plan developed with the family.

91.     In 2016 St. Elizabeth received $321,000 from the Commonwealth of Kentucky to address Neonatal Abstinence Syndrome in connection with Kentucky's development of a model for a Plan of Safe Care that meets CAPTA requirements.

92.     St. Elizabeth and its agents named as Defendants herein, acted at the direction of the Cabinet and its agents, also named as Defendants herein, in imposing the supervision restrictions upon Holly, David, and Baby AMS, pursuant to the "Prevention Plan" and the "Plan of Safe Care."

93.     St. Elizabeth and the Cabinet acted in concert with regard to the decision to hold Baby Schulkers and to require, as a condition of her discharge, that Holly be supervised with her children.

94.     The Schulkers familial rights, and Baby AMS and Holly's right to be free from seizure of their persons, were violated when Defendants, without reasonable basis, refused to release Baby Schulkers, thereby compelling Holly Schulkers, who was breastfeeding Baby Schulkers, to remain in the hospital with her.

95.     St. Elizabeth and the Cabinet acted in concert when they refused to discharge Baby AMS pursuant to her Pediatrician's order for 'normal newborn discharge" and instead requiring approval from "social services" which discharged Baby AMS "under supervision of the father of the baby per the CPS plan in place" and "pursuant to the "Prevention Plan" requiring supervision.

96.      As a direct and proximate result of the actions set forth within this count, Plaintiffs have experienced severe mental and emotional suffering and continue to experience severe mental and emotional suffering which would not have incurred but for the Constitutional violations set forth herein.

**COUNT III: UNLAWFUL SEIZURE OF THE CHILDREN BY KAMMER AND CAMPBELL IN VIOLATION OF 4TH AMENDMENT TO THE U.S.**

## CONSTITUTION; VIOLATION OF 42 U.S.C. 1983 WITHOUT PROCEDURAL DUE PROCESS; (KAMMER AND CAMPBELL)

97. Plaintiffs hereby reaffirm, reiterate, and incorporate by reference each and every allegation contained within this Complaint as if fully recited herein and further states as follows:

98. Plaintiffs BRB (age 9), BOB (age 8), EES (age 13) and EMS (age 9), are guaranteed certain rights under our Federal Constitution, including the right to be free from an unlawful seizure without a warrant and/or without probable cause while at school.

99. Social Workers within the state of Kentucky are authorized by statute and Administrative Regulation to interview children and receive the cooperation of school authorities only when the Cabinet has received a valid report of neglect or abuse of the children. (See KRS 620:030 and KAR 922:1:130).

100. On Monday, February 13, 2017, Kammer and Campbell had conclusive evidence that the children were not being abused or neglected yet, in complete bad faith, Kammer, as authorized by Supervisor Campbell, removed the children from class, brought into a room with a closed door, and interrogated them regarding their mother's (or stepmother's) drug abuse, about any discord in the family, alcohol consumption, and other unpleasant and unfounded issues. Neither of the Cabinet workers had a Court Order, warrant, or probable cause to do so.

101. The children did not feel they were free to leave the interview, nor would a reasonable child under the circumstances feel he or she was free to leave the room.

102.   Each interrogation was an unreasonable seizure of each child in violation of the 4th Amendment of the United States Constitution and actionable under 42 U.S.C. 1983 as a violation of each child's 4th Amendment rights without due process of law.

103.   As a direct and proximate result of Kammer's and Campbell's violations of law as set forth herein, Plaintiffs BRB, BOB, EES, and EMS suffered severe and extreme emotional distress which dramatically affected their stability, sense of safety, and innocence of their childhood and will continue to cause them severe emotional distress in the future.

104.   The state and hospital's actions set forth herein were significant deprivations of the Schulkers fundamental rights and an arbitrary use of government power which transcends the realm of negligence and constitutes deliberate indifference which is so clearly arbitrary it shocks the conscience.

**COUNT IV: NEGLIGENCE OF JANE DOE AND ST. ELIZABETH'S**

105.   Plaintiffs hereby reaffirm, reiterate, and incorporate by reference each and every allegation contained within this Complaint as if fully incorporated herein and further state as follows:

106.   St. E's, through its employees, owed a duty of reasonable care to Holly in administering and disseminating the results of her private medical information, including test results and procedures performed upon her while she was a patient under the Hospital's care.

107.   St. E's, through its employee, Davis or Jane Doe, negligently reported a false positive "presumptive" toxicological test and/or negligently failed to follow its own policy by obtaining a confirming toxicological test or waiting to test the umbilical test prior to notifying the Cabinet of the "presumptive" test results.

108.   As a direct and proximate result of St. E's negligence, Holly and David have suffered severe emotional distress and such would not have occurred absent St. E's negligence.

109.   St. E's is liable for the negligent acts of its employees, including Jane Doe, pursuant to the doctrine of Respondeat Superior.

### COUNT V: VIOLATION OF KRS 214.160(6); NEGLIGENCE PER SE: JANE DOE AND ST. E'S AS TO HOLLY (KRS 446.070)

110.   Plaintiffs hereby reaffirm, reiterate, and incorporate by reference each and every allegation contained within this Complaint as if fully incorporated herein and further state as follows:

111.   KRS 214.160 (6) sets forth the manner in which hospitals are required to obtain substance abuse tests for pregnant women and provides: "No person shall conduct or cause to be conducted any toxicological test pursuant to this section on any pregnant woman without first informing the pregnant woman of the purpose of the test."

112.   Holly's medical records contain a "stamped" signature of Holly's which purports to indicate that such consent was obtained from Holly.

113.   In fact no such consent was ever discussed or obtained from Holly.

114.   Holly was among the class of people who was intended to be protected by this statute and the harm suffered by Holly herein was the type of harm envisioned within the protection of the statute.

115.   The violation of KRS 214.160(6) was a substantial factor in causing the damages to Holly as the results of the drug test were improperly and prematurely divulged to the Cabinet which set in motion the events described herein.

116.   As such, Davis and/or Jane Doe and St. E's, pursuant to the doctrine of Respondeat Superior, were negligent per se pursuant to KRS 446.070 as to the events described herein.

117.   As a direct and proximate result of Jane Doe's and St. E's negligence, Holly suffered and continues to suffer severe emotional distress.

## COUNT VI: TORT OF OUTRAGE (ALL DEFENDANTS)

118.   The Plaintiffs hereby reaffirm, reiterate, and incorporate by reference each and every allegation contained within this Complaint as if fully recited herein and further state as follows:

119.   Defendant Kammer's decision to threaten Holly, less than 30 hours after the birth of her child, with "foster care" and "court action" to coerce her agreement to a "Prevention Plan" and "24/7" supervision, before there was reliable evidence to suggest Holly was using illicit drugs, was intentional and reckless.

120.   Defendant Kammer's decision to remove the children and step-children from their classroom to interrogate them, after receiving conclusive evidence Holly was not using illicit drugs, was intentional and reckless.

121.    Defendant Kammer and Defendant Campbell's decision to continue enforcing the "Prevention Plan", requiring Holly be supervised "24/7", after receiving conclusive evidence that she was not using illicit drugs, was intentional and reckless.

122.    Defendants' conduct was outrageous and intolerable and offends the generally accepted standards of decency and morality.

123.    There is a causal connection between Defendants' conduct and Plaintiffs' severe emotional distress.

## COUNT VII: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

124.    St. Elizabeth and its employees and agents owed a duty to Plaintiffs not to report a "preliminary" positive test to the Cabinet as a report of suspicion of abuse and neglect unless and until the "preliminary" test is confirmed by either a subsequent confirming test or examination of the umbilical cord confirming such a finding.

125.    Defendants report to the cabinet was not based upon reasonable cause.

126.    The Cabinet and its employees owed a duty to Plaintiffs not to investigate after receiving evidence that the report it received was not based upon reasonable cause and that there was no evidence of abuse or neglect.

127.    Defendants breached their duties to Plaintiffs as set forth herein.

128.    Plaintiffs were injured in that they suffered extreme emotional distress

129.    Defendants breach of their duties caused the extreme emotional distress.

## COUNT VIII: SLANDER PER SE

130.   Davis and/or Jane Doe's communication of the unconfirmed positive drug test results to the Cabinet were false and defamatory.

131.   The publication was unprivileged as the test reported was prohibited from use for any non-medical purpose.

132.   The publication was negligent

133.   Defendants suffered special harm as a result of the unauthorized publication.

## COUNT IX: PUNITIVE DAMAGES (ALL DEFENDANTS)

134.   Plaintiffs hereby reaffirm, reiterate, and incorporate by reference each and every allegation contained within this Complaint as if fully recited herein and further state as follows:

135.   All Defendants, jointly and severally, acted in a wanton, willful, deliberately indifferent, grossly negligent, reckless, and/or intentionally harmful manner with reckless disregard for the Fundamental Constitutional Rights and enumerated state rights of all Plaintiffs.

136.   The conduct of these Defendants needs to be deterred and punished severely and each defendant is therefore liable for punitive damages and attorney fees under both State and Federal Law including common law.

## PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiff demands as follows:

1.   That, prior to consideration by the Court of any dispositive motion, the Court permit discovery herein as to information solely within the control of the

Defendants so Plaintiffs will have a full and fair opportunity to present their case;

2. A judgment, jointly and severally, against all Defendants on each cause of action in a fair and reasonable amount for compensatory damages;

3. A trial by jury;

4. For an award of Punitive damages;

5. For an award of all Attorney Fees under both State and Federal Law for violations of the Plaintiff's civil rights;

6. Pre and Post judgment interest;

7. Court costs and expenses of this action; and

8. Any and all other relief or damages applicable to the facts of this matter or that the Court deems fitting and proper.

Respectfully submitted,
s/Paul J. Hill
Paul J. Hill, Esq.
KBA # 84563
2216 Dixie Highway, Suite 200A
Ft. Mitchell, KY 41017
(859) 491-8889
pauljhillesquire@aol.com

Gail Langendorf
E. Andre Busald
Busald Funk Zevely, P.S.C.
226 Main St.
Florence, KY 41042
(859) 371-3600
GLangendorf@BFZlaw.com
Andybusald@bfz.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that copy of the foregoing Second Amended Complaint was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system and copies will be mailed via U.S. Mail to those parties who are not served via the Court's electronic filing system. Parties may access this filing through the Court's system.

Ellen M. Houston, Esq.
Michael J. Enzweiler, Esq.
DRESSMAN  BENZINGER LAVELLE PSC
207 Thomas More Parkway
Crestview Hills, KY 41017
Counsel for Defendants, Saint Elizabeth
Medical Center, Inc., Ann Marie Davis,
Deborah Cinque, and Jane Doe

D. Brent Irvin, Esq.
CABINET FOR HEALTH AND FAMILY SERVICES
Office of Legal Services
275 East main Street 5W-B
Frankfort, KY 40621
Counsel for Co-Defendants,
Elizabeth Kammer, Allison Campbell,
and Jane Doe Kara X

<u>/s/ Gail M. Langendorf</u>