IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

CIVIL ACTION NO. 2:17-076 (WOB-CJS)


HOLLY SCHULKERS, ET AL.                        PLAINTIFFS

VS.                      <u>MEMORANDUM OPINION AND ORDER</u>

ELIZABETH KAMMER, ET AL                        DEFENDANTS


This matter is before the Court on the Kentucky Cabinet for Health and Family Services ("CHFS") defendants' motion to dismiss or in the alternative motion for summary judgment. (Doc. 56). The Court previously heard oral argument on this motion and took it under submission. (Doc. 73).

After further study, the Court now issues the following Memorandum Opinion and Order.

### Factual and Procedural Background[1]

On February 8, 2017, Plaintiff Holly Schulkers was admitted to St. Elizabeth Medical Center, Inc. ("St. Elizabeth") for a scheduled labor induction. (Doc. 34, ¶ 14). Holly's prenatal lab tests were "negative" for substance dependency or abuse; she had no history of drug use and would not require drug treatment upon delivering her child. *Id.* at ¶ 32. Nonetheless, roughly sixteen hours before Holly eventually gave birth, St. Elizabeth's tested

---

[1] An abbreviated timeline is attached as an appendix.

a sample of Holly's urine and, without running a confirming test,[2] charted a "presumptive positive" result for opiates. *Id.* at ¶¶ 28, 33; (Doc. 21-1 at 9 (sealed)). Holly did not consent to a urine or blood test for drugs; nor was she ever told that such a test had been performed. (Doc. 34, ¶¶ 16, 17, 33). The report, nevertheless, stated: "Results should not be used for non-medical purposes." (Doc. 34, ¶ 27); (Doc. 21-1 at 9).

Holly gave birth to AMS without complications on February 9, 2017. (Doc. 21-2 at 12–13).[3] Within the first hour after giving birth, Holly breastfed AMS. (Doc. 34, ¶ 16). On the morning of February 10, 2017, Holly's husband, Plaintiff David Schulkers, was informed by the pediatrician that the plan was to discharge mother and child sometime in the afternoon. *Id.* at ¶¶ 14–15.

A short time later, however, Holly was visited by Defendant Anne Marie Davis, a care coordinator and social worker with St. Elizabeth's. Davis informed Holly that she had tested positive for opiates and that AMS's umbilical cord was also tested but the results were pending. *Id.* at ¶¶ 16, 8. Holly explained to Davis that she had eaten Stacey's Everything Bagel Chips, which contained poppy seeds, and had taken some of her daughter's prescription cough medicine. *Id.* at ¶¶ 16, 19. Davis responded that none of

---

[2] This is known as a "Drug of Abuse with Reflex to Confirmation" test. (Doc. 34, ¶¶ 28, 33).

[3] The Second Amended Complaint misstates the birthdate as February 10, 2017, (Doc. 34, ¶ 15).

these items would cause a positive result unless the cough medicine contained codeine, which Holly was unable to confirm at the time. *Id.* at ¶ 16; (Doc. 21-1 at 2).[4]

Before receiving the toxicology results for the umbilical cord, Davis charted that Holly had a "Substance Use Disorder." (Doc. 21-1 at 1). Pursuant to her affirmative duty under Kentucky law,[5] Davis then reported to the Kentucky Cabinet for Health and Family Services via a web-based reporting system that Holly had a "positive drug screen" (the "Report"). (Doc. 67-3 at 1 (sealed)); (Doc. 34, ¶¶ 17, 25-26).[6] The CHFS intake worker who received the report did not speak with anyone at St. Elizabeth's. (Doc. 67-4, Grimes Dep. at 37, 48). CHFS accepted the report, concluding that Holly posed a "Risk of Harm"[7] for "testing positive for medication not prescribed to her" and assigned the case to Defendant Alison

---

[4] Davis' notes correspond with Holly's statement that she had taken cough medicine, and Davis advised Holly that if it contained codeine this would account for the opiate positive test results. (Doc. 21-1 at 2).

[5] KRS § 620.030(1)-(2) mandates that "[a]ny person who knows or has reasonable cause to believe that a child is dependent, neglected, or abused shall immediately cause an oral or written report to be made" to a local law enforcement, State police, or CHFS.

[6] The Report was made to CHFS approximately twenty (20) hours after Holly gave birth, and about thirty-eight (38) hours after the "presumptive positive" result was charted. (Doc. 21-1 at 1-3); (Doc. 34, ¶ 26). On its face, Davis' report corroborates the earlier conversation she had with Holly regarding the drug screen. (*See* Doc. 67-3 at 1).

[7] The CHFS Standard of Practice ("SOP") Manual delineates acceptance criteria structured around Kentucky statutory authority. (Doc. 67-7 at 9 (sealed)). The intake social worker will accept a report as a "Risk of Harm (Neglect)" if the child is "[p]laced at risk because the caretaker engages in a pattern of conduct that renders him/her incapable of caring for the immediate and ongoing needs of the child due to incapacity due to alcohol or other drug abuse." *Id.*; *cf.* KRS § 600.020(1)(a)(3) (defining an abused or neglected child).

Campbell. (Doc. 67-3 at 3).

Later that day, Defendant Deborah Cinque, a St. Elizabeth
Nurse Manager, informed the Schulkers that AMS could not be
discharged because hospital policy required she be observed for 72
hours for symptoms of withdrawal. (Doc. 34, ¶ 20); (Doc. 21-1 at
61). Holly was discharged and was allowed to continue
breastfeeding AMS during the 72-hour observation period. (Doc.
34, ¶ 21).

### A. "The Prevention Plan"

On the evening of February 10, two social workers with CHFS,
Defendants Elizabeth Kammer and "Kara," entered Holly's hospital
room. Holly was told she had tested positive for heroin. (Doc.
34, ¶ 35). Holly insisted there had been a mistake and explained
that she was a child care worker, her son's basketball coach,
volunteered at the school cafeteria, and did not use drugs. *Id.*
When Kammer requested Holly submit to another drug test, Holly
agreed, and nurses obtained another urine sample for testing. *Id.*
at ¶ 36; (Doc. 21-1 at 5, 10-11). In the meantime, Kammer, who
was still in training at the time, placed a phone call to Campbell,
her supervisor. Campbell spoke with Holly and stated that "until
this gets figured out you are no longer allowed to be around any
children without the supervision of approved individuals." (Doc.

34, ¶ 37); (Doc. 67-8, Kammer Dep. at 8–10).[8]  After this call, Kammer presented the Schulkers with a predominately handwritten "Prevention Plan."  (Doc. 67-9 (sealed)).

The one-page Prevention Plan states—in handwritten ink—that Holly was prohibited from having contact "with all children" unless an approved supervisor was within "eye & ear shot at all times (24/7)."  (Doc. 34, ¶ 41).  Kammer explained that a violation of these terms would result in the Schulkers' children being removed from their care.  *Id.* at ¶¶ 41–42.  Stamped at the bottom of the document, in all capital lettering, it states: "ABSENT EFFECTIVE PREVENTATIVE SERVICES, PLACEMENT IN FOSTER CARE IS THE PLANNED ARRANGEMENT FOR THIS CHILD."  *Id.* at ¶ 40.  In truth, there was no planned arrangement for foster care.  Rather, the foreboding stamped language is standard **on every prevention plan at CHFS**.  (Doc. 67-6, Campbell Dep. at 96–97 (sealed)).  The Schulkers were vehemently opposed to signing the document.  (Doc. 67-2, David S. Aff., ¶ 6); (*see* Doc. 67-1, Holly S. Aff., ¶ 8).  Yet the Schulkers were told if they did not agree to the Prevention Plan, their children would be removed from their care "and after that" CHFS would seek court intervention.  (Doc. 34, ¶ 42); (Doc. 67-1, ¶ 6).  Under these conditions, Kammer and the Schulkers signed the plan.  (Doc. 34, ¶ 42); (Doc. 67-9).

---

[8] As part of Campbell's conversation with Holly, she additionally asked "how did the heroin get into your system?" Further, she offered, "Let me get the help you need so you can be a better mother to your children." (Doc. 34, ¶ 37).

Holly's night nurse questioned the Prevention Plan and reported that the doctors and staff believed the initial toxicology test to be a false positive. (Doc. 34, ¶ 43).[9] She added that a number of "presumptive" positive tests had occurred in the past and women with open cases were generally allowed to leave with their newborns because CHFS did not get involved until the test was confirmed with an umbilical cord test. *Id.* Overhearing this, Defendant Kara pulled Holly's night nurse aside in the hallway and rebuked her, stating: "We are supposed to be working as a team, why are you pitting them against me?" *Id.*

## B. False Positive Revealed by Negative Subsequent Testing

After Kammer and Kara left, Holly's night nurse called St. Elizabeth's lab and advised the Schulkers that St. Elizabeth's uses a lower threshold level than required by federal regulations. *Id.* at ¶ 45. Two hours after signing the Prevention Plan, Holly's second urine test results—this time conducted with a Drug of Abuse with Reflex to Confirmation test—were returned as negative for any illegal substances. *Id.* at ¶ 46; (Doc. 21-1 at 89–90). Holly's nurse at the time phoned Kammer and left a voicemail. (Doc. 34, ¶ 46). However, staff at St. Elizabeth's, including Defendant Cinque, refused to discharge AMS. *Id.*

---

[9] This is supported by a St. Elizabeth social worker's note from the morning of February 11, 2017, which states that the initial drug test was "likely [a] false positive" and "there are no concerns from MOB's hx [medical history] by pediatrician and no nursing concerns." (Doc. 21-1 at 57).

The next morning, on February 11, 2017, Dr. James Otrembiak came to check on AMS. He discussed the initial toxicology results with the Schulkers and informed them that eating poppy seed bagel chips could cause a false positive. Further, he reported that on the previous day he had received a phone call from a CHFS social worker, during which he advised that there must have been a mistake with the initial drug screen. *Id.* at ¶ 47. Indeed, Dr. Otrembiak later charted:

> AWAITING DISPOSITION FROM SOCIAL SERVICE. NO NOTE IN CHART . . . Mom's repeat drug screen negative. Baby's cord blood drug screen still pending. Mom states she took some cough med[icine] prior to delivery and also had a bag of Stacy[']s chips with Poppy seeds while in labor. She showed me the bag! (poppy seeds, delsum, are among the Products that can cause a false positive for opiates on drug screen[)]. Planning on discharge tomorrow. Need final disposition for discharge from social service.

(Doc. 21-2 at 8 (sealed)).

That afternoon, at 1:32 p.m., St. Elizabeth's received the umbilical cord toxicology results, which were also negative for illegal substances. Twenty minutes later, a St. Elizabeth social worker e-mailed Kammer the results from the umbilical cord and Holly's second urine screen test. (Doc. 21-1 at 3); (Doc. 34, ¶ 48). Kammer confirmed to Holly she had received both. (Doc. 34, ¶ 48).

Although both tests were negative for drugs, before AMS could be discharged social services was required to approve the

discharge. (Doc. 34, ¶ 95). The Schulkers were permitted to take their child home the following day, February 12, at 10:30 a.m. (Doc. 21-2 at 1); (Doc. 34, ¶ 53). A St. Elizabeth social worker received a copy of the Child Protective Services ("CPS") discharge plan, and noted that "Per CPS plan, [AMS] may discharge to [Holly] under supervision of an approved supervisor. At this time both Mary Schulkers and David Schulkers (spouse) are approved supervisors." (Doc. 34, ¶ 95); (Doc. 21-1 at 12-13); (Doc. 21-2 at 4-5).

## C. The CHFS Investigation Continues

On Monday morning, February 13, 2017, Holly called Kammer and asked to be released from the Prevention Plan, to which Kammer responded that she needed to talk to Campbell because she was unsure how to proceed in the event of a false positive drug test. Campbell refused to lift the Prevention Plan. Consequently, David stayed home from work to "supervise" Holly around the children. (Doc. 34, ¶ 54). The Schulkers decided it was time to contact an attorney, who advised them to take a hair follicle drug test. *Id.* at ¶ 55.

That same day, Kammer and another CHFS employee interviewed the Schulkers' four school-aged children— BOB (age 8), BRB (age 9), EES (age 9), and EMS (age 13)— at their respective schools without a warrant. *Id.* at ¶¶ 56, 98-103. Each child was removed from their classroom, brought to a room where the door was then

closed, and questioned about, among other things, "mommy using drugs," discord in the family, alcohol consumption, and other personal family matters. *Id.* at ¶¶ 56-57, 100-01. During the interviews, school personnel were not permitted in the room and the children were not free to leave the room until released. The Schulkers only learned of these events from their children when they returned home from school crying. *Id.* at ¶¶ 56-58.[10]

On February 21, 2017, Holly's hair follicle drug test came back negative. *Id.* at ¶¶ 55, 65; (Doc. 67-1, ¶ 10). Holly's attorney at the time e-mailed the test results to CHFS staff, including Campbell and Kammer. In addition, Holly's attorney informed Campbell that Holly would no longer follow the Prevention Plan and requested that it be formally lifted. (Doc. 34, ¶¶ 65-67); (Doc. 67-1, ¶ 10). At that time, Campbell e-mailed her supervisor, Jessica Brown for guidance. Brown agreed with Holly's attorney and explicitly advised Campbell by phone to lift the Prevention Plan. Further, Brown sent an e-mail to Campbell with instructions to respond to Holly's attorney and inform her that the "negative hair follicle test in conjunction with the other information obtained supporting protective factors within the family (collateral interviews, AOC checks, TWIST checks, interviews etc.) warrant[s] lifting the supervision plan at this

---

[10] Sometime after February 13, 2017, Campbell or Kammer contacted David's ex-wife (biological mother to EES and EMS) and requested the children's immunization records. (Doc. 34, ¶¶ 60, 68).

time. We will be reaching out to the family to update our prevention plan to reflect this change." (Doc. 67-5, Brown Dep. at 41–42). Campbell, however, chose not to communicate this to the Schulkers.

Over a month later, the Schulkers were still under the restrictions of the Prevention Plan and CHFS's continuing investigation. Repeated requests were made by counsel to issue a finding of "unsubstantiated" and to close the investigation, but each request was denied and the Prevention Plan remained in effect. (Doc. 34, ¶¶ 66–67, 69).

Finally, on April 7, 2017—nearly two-months after the Schulkers left St. Elizabeth's—the case was labeled "unsubstantiated." The Schulkers were notified of this by way of a letter in the mail, received on April 10, which also informed them that the Prevention Plan was terminated. (Doc. 67-1, ¶ 11); (Docs. 34, 69). Throughout this time, there was no court order in place, nor did CHFS seek such an order. (Doc. 34, ¶ 39).

Plaintiffs filed this lawsuit on May 4, 2017, alleging, as relevant to the CHFS defendants, claims for violations of the Fourth and Fourteenth Amendments in relation to the imposition of the Prevention Plan and the interviews of their children. They allege that defendants carried out their actions in bad faith so that they could obtain federal reimbursement funds pursuant to Title IV-E, 42 U.S.C. § 672 *et seq.*. (Doc. 34, Second Amended

Compl. ¶ 70). Plaintiffs assert that, under this provision, states are eligible to receive reimbursement for the costs of a child abuse investigation and other administrative costs when there is a defined "Prevention Plan" in place under which foster care of the planned arrangement for the child. (*Id.*). The Schulkers allege that the CHFS defendants initiated the investigation, imposed the Prevention Plan, and prolonged the investigation in order to reap enhanced benefits under Title IV-E.

## *Analysis*

The defendant social workers are employed by the Commonwealth of Kentucky, which is immune from suit in federal court under the Eleventh Amendment. Nevertheless, they can be sued in their individual capacities under 42 U.S.C. § 1983, if they violated the plaintiffs' federally protected constitutional or statutory rights. However, individuals such as these defendants are entitled to qualified immunity, if they can meet the criteria for that defense.

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

In recent decisions the Supreme Court has clarified what it means for a legal right to be "clearly established." In *White v. Pauly,* 137 S. Ct. 548 (2017), the Court stated:

> Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. . . . While this Court's case law does not require a case directly on point for a right to be clearly established *existing precedent must have placed the statutory or constitutional question beyond debate.* . . . In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law.

*Id.* at 551 (citations and internal quotation marks omitted) (emphasis added).

The following term, the Court emphasized that a defendant "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Kinsela v. Hughes,* 138 S. Ct. 1148, 1153 (2018) (internal quotation marks and citation omitted). Thus, the law of qualified immunity assumes that the defendant has knowledge of existing law, or at least he or she is charged therewith. *See Harlow*, 457 U.S. at 819 ("[A] reasonably competent public official should know the law governing [their] conduct.").

This Court thus must decide whether the CHFS defendants violated plaintiffs' constitutional rights and, if so, whether those rights were clearly established "beyond debate."

A. **The Prevention Plan**

Plaintiffs assert violations of their Fourteenth Amendment rights to both substantive and procedural due process in the imposition of the Prevention Plan.

1. **Substantive Due Process**

The touchstone of due process is the protection against arbitrary governmental action, including "the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998) (citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). Substantive due process aims to prevent "governmental power from being used for purposes of oppression." *Daniels*, 474 U.S. at 331.

This test is also sometimes stated as one of arbitrary and capricious exercise of state power, and the state action "will withstand substantive due process attack unless it is not supportable on any rational basis or is willful and unreasoning action, without consideration and in disregard of the facts or circumstances of the case." *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1221 (6th Cir. 1992) (citations and internal quotation marks omitted).

"Substantive due process claims may be loosely divided into two categories: (1) deprivations of a particular constitutional guarantee; and (2) actions that 'shock the conscience.'" *Pittman*

*v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 640 F.3d 716, 729 (6th Cir. 2011) (citation and internal quotations omitted). Plaintiffs' claims here arise under the first of these prongs.

The parent-child relationship gives rise to a fundamental liberty interest of which a parent may not be deprived absent due process of law. *Kottmyer v. Maas*, 436 F.3d 684, 689 (6th Cir. 2006). That interest extends to any matter that touches on "the interest of parents in the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000). This right is, however, qualified due to the balance that must be struck between a parent's rights and the compelling countervailing interest the government has in protecting children. *Kottmyer*, 436 F.3d at 690.

The Sixth Circuit has held that "the right to familial association is not implicated merely by governmental investigation into allegations of child abuse." *Id.* At least as it pertains to substantive due process rights, "[a] parent is necessarily deprived of his or her right to custody and control of their child, either permanently or temporarily, when a child is removed from the home." *Id.* at 691. A mere investigation without more, however, "does not infringe upon a parent's right to custody or control of a child." *Id.*

The Court thus concludes that the investigation itself did not violate plaintiffs' rights to substantive due process.

However, the Schulkers also allege that they were coerced into signing the Prevention Plan and that its restrictions interfered with their fundamental right to rear their children.

The CHFS Defendants cite *Kottmyer* for the proposition that parents' fundamental rights to familial association are not infringed so long as governmental interference stops short of killing the child or taking custody of the child. This is incorrect.

In *Troxel*, the Court considered a very broad state statute which provided that "*any person* may petition the court for visitation rights *at any time*," and permitted a court to grant such visitation rights whenever "visitation may serve *the best interest of the child*." *Troxel*, 530 U.S. at 67 (alteration in original). Thus, notwithstanding the objections of a parent, the state courts could "disregard and overturn any decision by a fit custodial parent concerning visitation whenever a third party affected by the decision files a visitation petition, based solely on the judge's determination of the child's best interests." *Id.*

The state did just that in *Troxel*, despite the plaintiff-mother's opposition to the amount of visitation sought by her deceased husband's parents, who petitioned for the right to visit their granddaughters. *Id.* at 60–63. A plurality of the Supreme Court held that the statute unconstitutionally infringed on the mother's fundamental right to make decisions concerning the care,

custody, and control of her daughters. *Id.* at 72–73. The Court
based its holding on the principle that "there is a
[constitutional] presumption that fit parents act in the best
interests of their children." *Id.* at 68. That is, "so long as a
parent adequately cares for his or her children (i.e., is fit),
there will normally be no reason for the State to inject itself
into the private realm of the family to further question the
ability of that parent to make the best decisions concerning the
rearing of that parent's children." *Id.* at 68–69. In applying
that standard, the Court noted that no court had found that the
mother was an unfit parent. *Id.* at 68. Moreover, the interference
with the mother's fundamental rights did not involve an attempt by
the state to remove the children from her custody. *Id.* at 71. It
follows then that complete separation is not necessary for a
finding of interference with the fundamental right to familial
relations.

Here, the Prevention Plan did not completely separate Holly
from her children. However, much like the visitation plan at issue
in *Troxel*, the Prevention Plan limited Holly's ability to decide
when and where she could be alone with her children. CHFS's
implementation of the Prevention Plans thus suffers from the same
constitutional defect: employing broad, unlimited government power
to interfere with a fit parent's right to make decisions concerning
the care, custody, and control of their children. *Id.* at 65–66,

16

73.

Further, no court found Holly to be unfit as a parent, just as no such finding was present in *Troxel*. In fact, in contrast to how the state curtailed parental rights in *Troxel*, here there was never any Court involvement. Instead, by imposing the Prevention Plan, Defendants treated a presumptive positive drug screen (which utilized a lower threshold than federal regulations) as child abuse *per se*. In doing so, they disregarded the constitutional presumption "that fit parents act in the best interests of their children," *Troxel*, 530 U.S. at 68, as well as Kentucky statutes that define child abuse.

The undisputed facts did not give the CHFS defendants evidence of child abuse or neglect. In relevant part, KRS § 600.020(1)(a)(3) specifically defines an "abused or neglected child" as one "whose health or welfare is harmed or threatened with harm when his or her parent . . . [e]ngages in *a pattern of conduct* that renders the parent incapable of caring for the immediate and ongoing needs of the child including, but not limited to, parental incapacity due to alcohol and other drug abuse." *Id.* (emphasis added). Drug abuse is particularly defined and characterized in another section as a "pattern[] of use." KRS § 222.005 (listing examples).

Holly had no prior history of drug use; her prenatal screens were all negative; she had no prior interaction with CHFS; and

17

doctors and nurses believed the initial drug screen to be a false positive. The initial presumptive-positive drug screen thus does not constitute child abuse *per se*. And a Kentucky court would likely conclude the same. *Compare C.J.M. v. Cabinet for Health and Family Servs.*, 389 S.W.3d 155, 161–62 (Ky. Ct. App. 2012) (finding sufficient grounds for neglect or abuse existed where the risk of abuse existed because the child tested positive for marijuana at birth and the parents admitted to using such before and during the pregnancy), *with M.E.C. v. Commonwealth*, 254 S.W.3d 846, 854 (Ky. Ct. App. 2008) (children were not abused or neglected where CHFS had not shown that the children suffered any direct, emotional or physical injury from the parent, and the witnesses testified that the parent was a nurturing parent and that the children were well-cared for by the parent). Further, a veteran CHFS intake official testified that Holly's case should have been closed once the confirming tests came back negative. (Doc. 67-4, Grimes Dep. at 61–62).

Because more than an investigation occurred in this case, and Holly's contact with her children was constrained for nearly two months without a finding that she was unfit as a parent, the Schulkers' allegations are sufficient to state a claim for violation of their fundamental right to family integrity.

## 2. Procedural Due Process

Plaintiffs also assert that they were denied their rights to procedural due process because they did not voluntarily sign the Prevention Plan and thus were entitled to process before its imposition.

The case law on this issue, distilled, holds that it is not inherently coercive for authorities to obtain parental consent to a safety plan by threatening to enforce legal rights, such as the right to initiate formal removal proceedings. *See Smith v. Williams-Ash*, 520 F.3d 596, 599-600 (6th Cir. 2008). In *Smith*, the Sixth Circuit adopted the reasoning of the Seventh Circuit in *Dupuy v. Samuels*, 465 F.3d 757 (7th Cir. 2006), which held that when a parent voluntarily consents to a safety plan, "no hearing of any kind is necessary; hearings are required for deprivations taken over objection, not for steps authorized by consent." *Id.* at 599-600 (quoting *Dupuy*, 465 F.3d at 761-62).

*Dupuy* notes, however, that a threat does constitute duress where the state threatens action it cannot lawfully carry out or the consent obtained is the product of misrepresentations or other improper means. *Dupuy*, 465 F.3d at 762-63. Then, the threat is "not grounded in proper legal authority," and the consent is involuntary. *Id.* at 763.

The Court in *Smith* also acknowledged that consent voluntarily obtained may become involuntary during the course of a safety plan

when parental repudiation is ignored. *Smith*, 520 F.3d at 600 (discussing *Farley v. Farley*, 225 F.3d 658, Nos. 98-6114, -6115, 2000 U.S. App. LEXIS 17580, 2000 WL 1033045, at * 4 (6th Cir. July 19, 2000) (table)). The court, however, distinguished *Farley* by emphasizing that the Smiths never attempted to contact social services to revoke their consent at any time, an option contained in the plan. *Id.* at 600. As the Court explained, "the [parents] remained in the safety plan voluntarily at all times," unlike *Farley*, and no argument was made "that they involuntarily consented to *enter* into the plan." *Id.*

Accepting the facts alleged by plaintiffs as true, this case more closely resembles the circumstances in *Farley*. Unlike in *Smith*, the CHFS Defendants did not merely seek to enforce a legal right by offering the Schulkers the means to avoid a formal removal proceeding. *Id.* at 599–600; *see also Schattilly v. Daugharty*, 656 F. App'x 123, 129-30 (6th Cir. 2016) (concluding that under *Smith*, merely "threatening removal proceedings" to secure the parents' consent does not violate clearly established law). Rather, *before* the Schulkers were even presented with the Prevention Plan, Campbell informed them that "until this gets figured out you are no longer allowed to be around any children without the supervision of approved individuals." (Doc. 34, ¶ 37). Then, when presented

with the plan,[11] the Schulkers were advised that if they did not adhere, CHFS would remove the children "and after that" seek judicial intervention.  *Id.* at ¶ 39.

Additionally, at the bottom of the Prevention Plan, in all capital letters it states: "ABSENT EFFECTIVE PREVENTATIVE SERVICES, PLACEMENT IN FOSTER CARE IS THE PLANNED ARRANGEMENT FOR THIS CHILD."  Defendant Campbell readily admitted that there was, in fact, no planned arrangement for foster care.  (Doc. 67-6, at 96–97).

Thus, the CHFS Defendants did not just threaten to exercise a legal right to initiate removal proceedings.  Rather, they stated that they could, and would, remove the children from the Schulkers' custody *before* a hearing was held or a court order was obtained, a proposition without legal authority.  Moreover, the facts do not indicate that any exigency existed, and it is well established "that children may not be summarily removed from the custody of their parents except in emergency circumstances." *Huynh Thi Anh v. Levi*, 586 F.2d 625, 632 (1978) (citing *Stanley v. Illinois*, 405 U.S. 645 (1972)).

Nothing in *Smith* or *Dupuy* permits social service workers to misrepresent their legal authority with impunity.  With no authority to immediately remove the children over parental

---

[11] Notably, unlike the plan in *Smith*, which specifically set forth that "[Y]our decision to sign this safety plan is voluntary," here there is no such indication of "voluntariness."  520 F.3d at 600.

objection, a threat to that effect is tantamount to duress, rendering the Schulkers' consent involuntary. And, unlike in *Smith*, 520 F.3d at 600, the Schulkers adamantly maintain that they signed the plan believing that if they refused CHFS would "*immediately* take [their] children." (Doc. 34, ¶ 42) (emphasis added); (Doc. 67-1, ¶ 8); (Doc. 67-2, ¶ 8); *see Croft v. Westmoreland Cty. Children and Youth Servs.*, 103 F.3d 1123, 1125 & n.1 (3d. Cir. 1997) (concluding that threatening immediate foster care is "blatantly coercive").

Moreover, even if plaintiffs voluntarily consented to the imposition of the Prevention Plan, they did not remain in the "plan voluntarily at all times." *Smith*, 520 F.3d at 600. As in *Farley*, the Schulkers allege that they twice explicitly asked for the Prevention Plan to be lifted. The Schulkers made their request the day after their child was discharged from the hospital—when the second drug screen and umbilical cord test were returned negative—and again when counsel notified CHFS that the Schulkers would no longer follow the restrictions. (Doc. 34, ¶¶ 54, 67); (Doc. 67-1, ¶ 10). Because the CHFS Defendants kept the Schulkers under the restrictions of the Prevention Plan, they thereby violated the principles set forth in *Farley*.

For these reasons, the Court concludes that plaintiffs have

pled a violation of their procedural due process rights.[12]

### 3. "Clearly Established"

Having concluded that plaintiffs have adequately pled that the CHFS defendants violated their substantive and procedural due process rights under the Fourteenth Amendment, the Court must determine whether those rights were clearly established at the time in question.

First, substantive due process. The logical extension of *Troxel v. Granville*, 530 U.S. 57 (2000), is that parent-child contact need not be completely severed to constitute an interference with the fundamental right to family relations. And the Sixth Circuit has recently emphasized that we "do not require a prior, 'precise situation'" or "a finding that 'the very action in question has previously been held unlawful,'" to conclude that

---

[12] The Court rejects Defendants' argument that Campbell cannot be held liable because she merely supervised the investigation. It is true that without more, a supervisor is not vicariously liable under § 1983 for the conduct of subordinates simply because they occupied a position of authority. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). However, a § 1983 plaintiff need only "show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *See, e.g., Coley v. Lucas Cty.*, 799 F.3d 530, 542 (6th Cir. 2015) (quoting *Taylor v. Mich. Dep't of Corrs.*, 69 F.3d 76, 81 (6th Cir. 1995)). Here, Kammer and/or Kara were purportedly the individuals who drafted the Prevention Plan, fraudulently secured the Schulkers' signatures, and personally conducted the investigation and warrantless, in-school interviews. But contrary to Defendants' position, Campbell's alleged conduct in this instance is sufficient for purposes of liability under § 1983. The Schulkers allege that Campbell directed that a Prevention Plan be implemented, authorized Kammer to conduct the warrantless, in-school interviews, and repeatedly refused to lift the Prevention Plan restrictions. (Doc. 34, ¶¶ 47–40, 54, 56, 65–69, 100; Doc. 67-5, Brown Dep. at 41–42). Therefore, because the allegations indicate that Campbell "authorized, approved or knowingly acquiesced in the unconstitutional conduct" of her subordinates, the Schulkers have stated a claim under § 1983 against Campbell for violations of both the Fourth and Fourteenth Amendments.

officials had "fair warning" that their conduct was unconstitutional. *Guertin v. Michigan*, — F.3d —, Nos. 17-1698/1699/1745/17522/1769, 2019 WL 99088, at *15 (6th Cir. Jan. 4, 2019) (citations omitted).

On the facts of this case, the Court concludes that, at a minimum, a reasonable social worker in 2017 would have known that continuing to impose the Parenting Plan for two months after Holly's hair follicle test came back negative, and after defendants' supervisor explicitly told them to lift the Plan, violated the Schulkers' rights to familial integrity. The CHFS defendants are thus not entitled to qualified immunity on plaintiffs' substantive due process claim.

Next, procedural due process. As the above discussion makes clear, the Sixth Circuit held in 2008 that social workers may lawfully threaten to take action within their legal authority in order to obtain parental consent to a safety plan. *Smith*, 52 F.3d at 600. By implication, however, and by adoption of the reasoning in *Dupuy*, this case also conveys the inverse: obtaining "consent" through misrepresentations or threats outside one's legal authority is constitutionally repugnant. *See Guertin*, 2019 WL 99088, at *15 (noting that a right may be clearly established "from the general reasoning that a court employs") (internal quotation marks and citations omitted).

Moreover, eight years earlier, the Sixth Circuit in *Farley* denied qualified immunity to social workers, in part, on the principle that the plaintiff's consent to the placement of her children with their father "was not voluntary during the entire time period involved, which would invoke procedural due process protection which she was not afforded." *Farley*, 225 F.3d 658, at *4.

The fact that the children in *Farley* were removed from the mother's home and the children here were not is unimportant because "[p]rocedural due process claims do not implicate the egregiousness of the action itself, but only question whether the process accorded prior to the deprivation was constitutionally sufficient." *Howard v. Grinage*, 82 F.3d 1343, 1349—50 (6th Cir. 1996).

Therefore, the Court holds that it would have been clear to a reasonable social worker in 2017 that threatening parents with immediate removal of their children, where the facts gave rise to no such right, in order to obtain "consent" to a safety plan, and then refusing to release the parents from that plan under the facts here, would violate the parents' rights to procedural due process. As such, the CHFS defendants are not entitled to qualified immunity on this claim.

## B. The School Interviews

The Schulkers also allege that the CHFS Defendants'

warrantless in-school interviews of their children violated each child's Fourth Amendment and procedural due process rights. The due process claim, however, is subsumed by the Fourth Amendment. "[W]here another provision of the Constitution 'provides an explicit textual source of constitutional protection,' a court must assess a plaintiff's claims under that explicit provision." *Conn. v. Gabbert*, 526 U.S. 286, 293 (1999) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). "Because the Fourth Amendment provides an explicit textual source of constitutional protection against . . . physically intrusive governmental conduct, that Amendment, not the more generalized notion of '[procedural] due process,' must be the guide for analyzing these claims." *See Graham*, 490 U.S. at 394.

It is well settled that students do not shed their Fourth Amendment rights at the schoolhouse gate. *See e.g.*, *Safford Unified Sch. Dist. #1 v. Redding*, 557 U.S. 364, 370 (2009); *New Jersey v. T.L.O.*, 469 U.S. 325, 336–37 (1985). The CHFS defendants suggest that Fourth Amendment requirements do not apply to social workers conducting warrantless, in-school interviews of children as part of a child abuse investigation. (Doc. 56 at 25). To the contrary, the Supreme Court has stated that the requirements of the Fourth Amendment cover more than just police activities:

> [T]he Court has long spoken of the Fourth Amendment's strictures as restraints imposed upon "governmental action"—that is, "upon the activities of

> sovereign authority." Accordingly, . . . the Fourth
> Amendment [is] applicable to the activities of civil as
> well as criminal authorities . . . . Because the
> individual's interest in privacy and personal security
> "suffers whether the government's motivation is to
> investigate violations of criminal laws or breaches of
> other statutory or regulatory standards," *it would be*
> *anomalous to say that the individual and his private*
> *property are fully protected by the Fourth*
> *Amendment only when the individual is suspected of*
> *criminal behavior.*

*T.L.O.*, 469 U.S. at 335 (emphasis added and internal citations omitted).

It also is of no import that state statutes, regulations, or procedures may afford social workers greater latitude. Such enactments cannot displace the protections of the United States Constitution, even when the state acts to protect the welfare of children. *See Granholm v. Heald*, 544 U.S. 460, 486 (2005); *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 566 (2001); *see also Sibron v. New York*, 392 U.S. 40, 60–61 (1968).

Thus, as the Sixth Circuit observed in a case involving social workers, "the presumption appears to be that any state officer should operate with the default understanding that the Fourth Amendment applies to her actions, unless a specific exception to the requirements of the Fourth Amendment has been found to apply." *Andrews v. Hickman Cty.*, 700 F.3d 845, 859 (6th Cir. 2012); *cf. Wendrow v. Mich. Dep't of Human Servs.*, 534 F. App'x 516, 529 (6th Cir. 2013). And the courts that have specifically addressed in-school interviews by social workers have held that the Fourth

Amendment governs.[13] Accordingly, Fourth Amendment principles apply to in-school interviews conducted by state social workers.

Next, a person is "seized" within the meaning of the Fourth Amendment when an official, "by means of physical force or show of authority, terminates or restrains his freedom of movement through means intentionally applied," *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal citations and quotation marks omitted), such that in viewing "all of the circumstances surrounding the encounter" a reasonable person would not feel "free to leave," "decline the officers' requests," or "otherwise terminate the encounter." *Fla. v. Bostick*, 501 U.S. 429, 436–37 (1991) (quoting *Mich. v. Chesternut*, 486 U.S. 567, 573 (1988)).

There is no question that the Schulkers' children were "seized" during the interviews in question. Per Campbell's instructions, Kammer and another employee removed the children individually from their classrooms with the assistance of school officials and brought them to a room where the door was closed. School personnel were not allowed in the room. Each child—all between the ages of 8 and 13—was then questioned for roughly thirty minutes about "mommy using drugs," alcohol consumption, whether

---

[13] *E.g.*, *Greene v. Camreta*, 588 F.3d 1011, 1030 (9th Cir. 2009), *vacated as moot*, 131 S. Ct. 2020 (2011); *Michael C. v. Gresbach*, 526 F.3d 1008, 1014 (7th Cir. 2008); *Jones v. Hunt*, 410 F.3d 1221, 1225 (10th Cir. 2005); *Doe v. Heck*, 327 F.3d 492, 513–14 (7th Cir. 2003); *Lane v. Milwaukee Cty. Dep't of Soc. Servs. Children & Family Servs. Div.*, No. 10-CV-297-JPS, 2011 WL 5122615, at *5 (E.D. Wis. Oct. 28, 2011); *Smith v. Tex. Dep't of Family & Protective Servs. Child Protective Servs.*, No. SA-08-CA-940-XR, 2009 WL 2998202, at *9–11 (W.D. Tex. Sept. 15, 2009).

there was physical violence in the home, and other intimate details of their family life. (Doc. 34, ¶¶ 56-58); (Doc. 52, Kammer Dep. at 54, 56). The children were not free to leave until they were released by the social workers. (Doc. 34, ¶¶ 56-58, 100-01). These were, without question, seizures.

The next inquiry, then, is whether these seizures were reasonable. Reasonableness generally means the government must conduct the seizure pursuant to a warrant supported by probable cause and issued by a neutral magistrate, unless "specifically established and well-delineated exceptions" apply. *See*, *e.g.*, *City of Ontario v. Quon*, 560 U.S. 746, 760 (2010); *Terry v. Ohio*, 392 U.S. 1, 20 (1968). The warrant requirement is "riddled with exceptions," at least twenty to be precise, *Cal. v. Acevedo*, 500 U.S. 565, 582-83 (1991) (Scalia, J., concurring), but a "social worker" exception is not one of them. *See Andrews*, 700 F.3d at 859-60.

In *Terry*, the Court recognized prior judicial approval for a warrant is inherently impracticable in situations requiring "necessarily swift action predicated upon the on-the-spot observations of the officer on the beat." 392 U.S. at 20. To that end, the Court adopted a two-step inquiry to evaluate the reasonableness of a limited search or temporary seizure by determining: (1) whether the intrusion was "justified at its inception" by the existence of a "reasonable, articulable

suspicion" of unlawful activity (rather than probable cause); and
(2) whether the degree of the intrusion was "reasonably related in
scope to the circumstances which justified the interference in the
first place." *See id.* at 20–22; *United States v. Smith*, 594 F.3d
530, 536 (6th Cir. 2010).

Although the Supreme Court and the Sixth Circuit have yet to
address warrantless, in-school interviews by social workers, *see
Barber v. Miller*, 809 F.3d 840, 845 (6th Cir. 2015), other courts
have concluded that such in-school interviews violate a child's
Fourth Amendment rights. *Doe v. Heck*, 327 F.3d 492, 510, 514–15
(7th Cir. 2003); *Jones v. Hunt*, 410 F.3d 1228-1229 (10th Cir.
2005); *Greene v. Camreta,* 588 F.3d 1011, 1016–17, 1022 (9th Cir.
2009), *vacated as moot*, 131 S. Ct. 2020 (2011).

The CHFS Defendants admit that they did not have a court order
to interview the Schulkers' children, (Doc. 37 at 100), and they
do not argue that any exceptions to the warrant requirement apply.
The Court thus concludes that plaintiffs have adequately pled that
the school interviews violated their children's Fourth Amendment
rights.

The CHFS defendants' sole argument in defense of these claims
is that it was not clearly established that such in-school
interviews were unconstitutional. Defendants rely on the Sixth
Circuit's decision in *Barber v. Miller*, 809 F.3d 840 (6th Cir.
2015). However, in *Barber*, the court addressed only the "clearly

established" prong of the qualified immunity analysis and held that a child's Fourth Amendment right to avoid warrantless, in-school interviews conducted by social workers on suspicion of child abuse without parental consent, was not clearly established in January 2011. *Barber*, 809 F.3d at 845.

After 2011, however, the Sixth Circuit decided two cases which established that Fourth Amendment standards apply to social workers. *See Andrews v. Hickman Cty*, 700 F.3d 845 (6th Cir. 2012); *Kovacic v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 724 F.3d 687 (6th Cir. 2013). *Andrews* involved social workers and several police officers who entered and searched a home without permission and coerced the parents into allowing the social workers to interview their children outside their presence. 700 F.3d at 849–52. The social workers were granted qualified immunity, in large part because the court found that they were entitled to rely on the Sheriff's deputy's assessment of the propriety of entry. *Id.* at 863.

*Kovacic*, on other hand, concerned social workers who engaged in the warrantless removal of children from their homes in 2002. 724 F.3d at 698–99. In denying the social workers qualified immunity, the court emphasized the "*absence of pre-2002 case law specifically mentioning social workers,*" but it nonetheless concluded that "under our binding precedent [that] is insufficient to upset the presumption that *all government searches and seizures*

are subject to the strictures of the Fourth Amendment." *Id.* at 700 (emphasis added). *Kovacic* and *Andrews* thus provide clarifying statements of Fourth Amendment law applicable to social workers, which the *Barber* court could not take into account in assessing the state of the law in 2011.

Further, *Andrews* and *Kovacic* clearly establish two points which provide fair and clear warning to any reasonable social worker that the conduct alleged in this case violates the Fourth Amendment: (1) the Fourth Amendment applies to social workers; and (2) a social worker cannot effectuate the unreasonable seizure of a minor.

First, it was clearly established by the Sixth Circuit in 2012 that the Fourth Amendment applies to social workers because "any state officer should operate with the default understanding that the Fourth Amendment applies to her actions, unless a specific exception to the requirements of the Fourth Amendment has been found to apply." *Andrews*, 700 F.3d at 859. And there can be no doubt that "Fourth Amendment standards are the same, whether the state actor is a law enforcement officer or a social worker." *Id.* at 864.

Second, since at least 2013, "clearly established law prohibits the unreasonable seizure of a minor by state social workers." *Brent v. Wayne Cty. Dep't of Human Servs.*, 901 F.3d 656, 686 (6th Cir. 2018) (citing *Kovacic*, 724 F.3d at 699). The

standard for whether a seizure occurred has been clearly established for decades. *See, e.g.*, *Bostick*, 501 U.S. at 436–37; *Terry*, 392 U.S. at 16–19. Finally, in *Terry*, decided in 1968, the Court established the rule that, at minimum, a seizure must be "justified at its inception" by a reasonable, articulable suspicion, and "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20.

Consequently, by February 13, 2017, Campbell and Kammer were on notice that the Fourth Amendment's requirements applied to them, that a seizure would result if a person, even briefly, believed they were not free to leave or otherwise terminate the encounter, and that a seizure of a child must be justified at its inception by no less than a reasonable suspicion of child abuse. Therefore, under clearly established law, the CHFS Defendants were on notice that they were required to adhere, at the very least, to these minimal Fourth Amendment requirements.

It follows then that the CHFS Defendants are not entitled to qualified immunity if a reasonable social worker would believe that the CHFS Defendants lacked even a reasonable suspicion of child abuse. Here, no reasonable social worker could conclude Campbell and Kammer had grounds to suspect the Schulkers of child abuse or neglect when they conducted the interviews. To be sure, this is not a case where an official has "reasonably but mistakenly

conclude[d]" that the requisite predicate for a seizure existed (i.e., probable cause or reasonable suspicion). *Anderson*, 483 U.S. at 641. <u>Before the CHFS Defendants conducted the interviews</u>, they knew that Holly's initial positive drug test was a false positive in light of the negative results from the second urinalysis and the toxicology report for the umbilical cord. Kammer herself testified that she conducted the interviews despite having "[no] information that they [the Schulkers' children] were abused or neglected." (Doc. 52 at 51). A social worker who lacks any legitimate justification for seizing a child, but nonetheless seizes the child and interrogates them, would clearly know that her conduct is unconstitutional.

For the foregoing reasons, the CHFS Defendants are not entitled to qualified immunity on this claim.

Therefore, the Court being advised,

**IT IS ORDERED** that the CHFS defendants' motion to dismiss or in the alternative motion for summary judgment (Doc. 56) be, and is hereby, **DENIED**.

This 8th day of February 2019.



Signed By:

*William O. Bertelsman* WOB

United States District Judge

## Timeline

2/8/17:   Plaintiff Holly Schulkers is admitted to St. Elizabeth Hospital for delivery of her baby.

2/9/17:  Holly gives birth to AMS.

2/10:   Holly's husband is informed that mother and child should be discharged that afternoon.

2/10:   Later the same day, a hospital social worker informs Holly that her urine tested positive for opiates.  This result is reported to CHFS, which concludes that Holly is a risk to the child.

2/10/17:  Later, Holly is informed by the Hospital that the baby must remain in the hospital for observation for 72 hours.

2/10/17:  That evening, the defendant social workers visit Holly in her hospital room.  Holly is requested to take additional drug tests to which she agrees.  Also, she is told "until this gets figured out you are no longer allowed to be around any children without the supervision of approved individuals."

2/10/17.  Holly is then presented with a "Prevention Plan." Under the Plan, Holly is forbidden to be around any of her children without the supervision of approved individuals, which could be her husband or  mother-in -law.  Social worker Kammer tells Holly that any violation will result in all four children being removed from the home.  A stamp on the plan read "Absent effective preventative services, placement in foster care is the planned

35

arrangement for this child." This information was not accurate. Later that evening, results of Holly's additional urine test are reported, which are negative.

2/11/17: St. Elizabeth receives the results of the umbilical cord test, which was also negative for illegal substances. The hospital communicates this information to Kammer.

2/12/17: Holly is permitted to take the new baby home but must observe the Prevention Plan.

2/13/17: Holly calls Kammer and requests to be released from the Prevention Plan, but the request is denied by Campbell. The Schulkers hires an attorney who advises Holly to take a hair follicle test.

2/13/17: The defendant social workers go to the schools that the four older children, ages 8 to 13, attend. No warrant or parental permission is obtained. The children are interrogated concerning family conditions, particularly whether Holly uses drugs.

2/21/17: Hair follicle test is returned negative. Counsel tells defendants that Holly will no longer follow the Prevention Plan. Supervisor orders Plan lifted, directs Campbell to inform attorney Plan will be lifted, but Campbell does not comply. Plan is kept in place officially but not enforced. Case against Holly on agency's record kept open.

4/7/17: Holly's case labelled "Unsubstantiated" by agency.

4/10/17: Plaintiffs receive notice from agency that Plan is terminated.