**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON**

**CASE NO. 17-cv-76 (WOB-CJS)**

**HOLLY SCHULKERS, ET AL.**                                    **PLAINTIFFS**

**VS.**                          **MEMORANDUM OPINION AND ORDER**

**ELIZABETH KAMMER, ET AL.**                                   **DEFENDANTS**


This matter is before the Court on Plaintiffs' Motion for Partial Summary Judgment, (Doc. 172), Defendant St. Elizabeth's Motion for Summary Judgment, (Doc. 174), and the CHFS Defendants' Renewed Motion for Summary Judgment. (Doc. 177). The Court heard oral argument on these motions on March 4, 2022. Having heard the parties, and after careful consideration, the Court now issues the following Memorandum Opinion and Order.

*FACTUAL AND PROCEDURAL BACKGROUND*

**A.   Baby AMS's Birth and the Initial Drug Test**

On February 8, 2017, Plaintiff Holly Schulkers was admitted to St. Elizabeth Medical Center for a scheduled labor induction. (Doc. 150 at ¶ 13). Holly's prenatal labs were "negative" for substance dependency or abuse; she had no history of drug use and would not require drug treatment upon delivering her child. (*Id.* at ¶ 31). Nonetheless, pursuant to a hospital policy that mandates the screening of every laboring mother for drugs, St. Elizabeth tested a sample of Holly's urine and, without running a confirming

1

test, charted an abnormal result.[1]   (*Id.* at ¶¶ 24-25, 32; Doc. 21-1 at 9.).   The results stated: "Results should not be used for non-medical purposes." (Doc. 150 at ¶ 26; Doc. 21-1 at 9).   Despite her signature appearing on three different forms clearly stating that her urine would be screened for drugs, Holly claims she was never informed that St. Elizabeth would perform a drug screen. (Doc. 121-1 at 1, 4, 6; Doc. 150 at ¶¶ 16, 32).

Holly gave birth to Baby AMS without complications on February 9, 2017 at 2:08 PM, roughly sixteen hours after her presumptive positive drug screen. (Doc. 21-2 at 1). Holly was permitted to breastfeed Baby AMS throughout her hospital stay. (*Id.* at 4).   On the morning of February 10, 2017, Holly's husband, Plaintiff David Schulkers, was informed by Baby AMS's pediatrician, Dr. Ebru Gultekin, that the plan was to discharge Holly and Baby AMS sometime that afternoon.   (Doc. 150 at ¶ 14).

---

[1] Plaintiffs' briefs focus heavily on a 2016 contract between the Commonwealth of Kentucky and St. Elizabeth, (the "Contract"), which aimed to identify pregnant mothers with opiate and opioid use disorders to combat Neonatal Abstinence Syndrome in the Northern Kentucky area. (Doc. 172-1 at 34). The Contract, in relevant part, stated that St. Elizabeth would provide "trauma-informed and evidence-based" services, including "screening, assessment, treatment and recovery services for both the mother and her children." (*Id.*).   The Contract established the St. Elizabeth Neonatal Abstinence Syndrome ("NAS") Program. (*Id.* at 38-39). Under this program, St. Elizabeth was to develop evidence-based residential treatment services, transitional housing, and other recovery efforts to support pregnant and parenting women with opiate use disorders. (*Id.* at 38). The Commonwealth paid St. Elizabeth $321,100 for this program. (*Id.* at 34). As will be explained further, the Contract is not comprehensive enough to elevate St. Elizabeth to a state actor.

Just a short time later, however, Holly was visited by Anne Marie Davis, a care coordinator and social worker for St. Elizabeth. (*Id.* at ¶ 15). She informed Holly that her urine drug screen was positive for opiates and that Baby AMS's umbilical cord had been sent for further testing. (*Id.*). Holly explained to Davis that she had eaten Stacey's Everything Bagel Chips, which contained poppy seeds, and had taken some of her daughter's prescription cough medicine. (*Id.* at ¶¶ 15, 18). Davis responded that none of these items would cause a positive result unless the cough medicine contained codeine, which Holly was unable to confirm at the time. (Doc. 21-1 at 2).

Later that day, a St. Elizabeth nurse manager, Deborah Cinque, informed the Schulkerses that Baby AMS could not be discharged because hospital policy required she be observed for 72 hours for symptoms of withdrawal. (Doc. 150 at ¶ 20; Doc. 21-1 at 5). The Schulkerses claim they asked for Baby AMS to be discharged, but St. Elizabeth refused. (Doc. 150 at ¶ 21). Holly was discharged on February 11, 2017 and was free to continue breastfeeding Baby AMS during the 72-hour observation period. (*Id.* at ¶ 30).

Approximately twenty hours after Holly gave birth and thirty-eight hours after the "presumptive positive" result was charted, Davis reported Holly's positive drug screen to the Cabinet of Health and Family Services ("CHFS") via a web-based reporting system. (Doc. 21-1 at 1–3). The transmission stated:

3

> Holly [Schulkers] delivered baby on 2/9. [Urinary Drug
> Screen] was positive for opiates 300. At first Holly
> did not know why she would have had a positive drug
> screen. No prescriptions. Later she stated she was
> taking her other daughter's prescribed cough medicine.
> Asked if there was codiene [sic] in the cough medicine
> as this would account for positive screen. Holly did
> not know. Holly has 4 other biological children in her
> custody. Baby's [umbilical] cord was sent for tox
> screen.

(Doc. 67-3 at 1).

A centralized intake social worker with CHFS named Bethany Grimes received the report submitted by Davis. (*Id.* at 3). Grimes was responsible for determining whether reports met CHFS's criteria for opening a case. Internal policies dictated that intake social workers, like Grimes, accepted reports alleging risk of harm if a child is "placed at risk because the caretaker engages in a pattern of conduct that renders him/her incapable of caring for the immediate and ongoing needs of the child due to incapacity due to alcohol or other drug use." (*Id.*). Grimes testified that because Holly admitted to taking unprescribed drugs, this was a "pattern of conduct" sufficient to at least open an investigation. (Doc. 67-4, Grimes Dep. at 53:15–17).

## B.    The Prevention Plan

The case was assigned to Defendants Alison Campbell and Elizabeth Kammer, who were social workers with CHFS. On the evening of February 10, 2017, Defendant Kammer and Kara Bruce, another social worker with CHFS, visited Holly in her hospital

4

room.   Kammer and Bruce asked Holly for the names of her other children and where they went to school and inquired about Holly's "drug abuse."  (Doc. 150 at ¶ 34).  Holly insisted that there had been a mistake and explained that she was a child care worker, her son's basketball coach, volunteered at the school cafeteria, and did not use drugs.  (*Id.*).  Kammer asked Holly to take another drug test, and Holly agreed.  Holly's urine was tested for the second time around 8:00 PM that evening.  (Doc. 21-1 at 5).  The results from the umbilical cord test were still pending.

Kammer, who was still in training, then called her supervisor, Defendant Campbell, who spoke with Holly over the phone.  Holly alleges that Campbell asked her, "How did the heroin get into your system?" (Doc. 150 at ¶ 36).  When Holly insisted that the test was in error, Campbell allegedly told her, "Well, until this gets figured out you are no longer allowed to be around any children without the supervision of approved individuals." (*Id.*).

After the conversation with Campbell, and before the results of the umbilical cord test and second urine test came back, Kammer presented Holly with a predominately handwritten, single-page document, titled "Prevention Plan." The Plan required Holly to have "supervised contact with all children by approved supervisors until notified by CHFS." (Doc. 67-9).  According to the Plan, "supervision" meant that Holly could not be alone with her children and must remain within "eye and earshot" of approved supervisors

5

"at all times (24/7)." (*Id.*).  According to Plaintiffs, Kammer explained to Holly that if she violated the Plan, all of her children would be removed from her care "and after that" CHFS would seek a court order.  (Doc. 150 at ¶ 39).

Kammer approved David Schulkers (Baby AMS's father) and Mary Schulkers (David's mother and Holly's mother-in-law) as supervisors.  (*Id.*).  Plaintiffs claim that Kammer explained to Holly and David that "if the supervisor steps out of the room, Holly has to follow and if the supervisor has to go to the bathroom Holly has to remove herself until the supervisor returns" and "if any restrictions were violated the children would be removed." (*Id.* at ¶ 40).

At the bottom of the Plan was a stamp that stated: "ABSENT EFFECTIVE PREVENTATIVE SERVICES, PLACEMENT IN FOSTER CARE IS THE PLANNED ARRANGEMENT FOR THE CHILD." (Doc. 67-9) (emphasis in original).  CHFS claims it did not actually have any plans for foster care for the Schulkerses' children but rather that this language is stamped on the bottom of every prevention plan.  (Doc. 53-1, Campbell Dep. 96:11-100:16).  The Schulkerses signed the document less than thirty hours after Holly gave birth and under the belief that if they did not agree to the Prevention Plan, all of their children would be removed from their care.  (Doc. 121, Holly Schulkers Dep. at 87:17-88:4).

6

According to Plaintiffs, while Kammer and Bruce were still in the room, Holly's night nurse, Lauren DeFilippo Shaw, questioned the Prevention Plan and reported that Baby AMS was clearly healthy and that the nursing staff and doctors believed that Holly's first urine test was a false positive. (Doc. 150 at ¶ 42). Nurse Shaw added that, in the past, other women with open CHFS cases could leave the hospital with their newborns, and that she had seen several situations in which CHFS would not get involved until after the initial test results were confirmed with umbilical cord testing. (*Id.*). Overhearing this, Bruce allegedly pulled Nurse Shaw aside in the hallway and said, "We are supposed to be working as a team, why are you pitting them against me?" (*Id.*; Doc. 164, Shaw Dep. at 50:15-51:4).

### C.   Subsequent Testing Comes Back Negative

Approximately two hours after the Schulkerses signed the Prevention Plan, Holly's second urine test results came back as negative for any illegal substances. (Doc. 21-1 at 5). Holly's nurse called Kammer and left a voicemail. (*Id.*).

Between 5:00 AM and 6:00 AM the next day, February 11, 2017, the Schulkerses claim Dr. James Otrembiak visited Holly's hospital room to check on Baby AMS and discuss the toxicology results. During the visit, he allegedly told Holly that he had received a phone call from a CHFS social worker the day before stating that Holly had tested positive for drugs, and that he had informed the

social worker that he believed the test was a false positive. (Doc. 150 at ¶ 46). He also informed the Schulkerses that eating poppy seed chips could cause a positive result. He subsequently charted:

> AWAITING DISPOSITION FROM SOCIAL SERVICE. NO NOTE IN CHART ... Mom's repeat drug screen negative. Baby's cord blood drug screen still pending. Mom states she took some cough med prior to delivery. And also had a bag of ... chips with Poppy seeds while in labor. She showed me the bag! [ ]poppy seeds, delsum, are among the Products that can cause a false positive for opiates on drug screen. Planning on discharge tomorrow. Need final disposition for discharge from social service.

(Doc. 21-2 at 8) (emphasis in original).

At roughly 1:00 PM on February 11, 2017, St. Elizabeth received Baby AMS's umbilical cord test results, which were also negative for any illegal substances. (*Id.* at 40). Within the hour, St. Elizabeth e-mailed the negative test results from both Holly's second urine test and AMS's umbilical cord test to Defendant Kammer. (*Id.* at 41). Kammer admits she received the emails that same day. (Doc. 154 at ¶ 47).

Despite knowledge that both tests were negative for drugs, CHFS kept the Prevention Plan in place. A St. Elizabeth employee received a copy of the Prevention Plan, and charted that: "Per CPS plan, [Baby AMS] may discharge to [Holly] under supervision of an approved supervisor. At this time both Mary Schulkers and David Schulkers (spouse) are approved supervisors." (Doc. 21-2 at 40-41). St. Elizabeth has an internal policy that states: "If a CPS

report is made and accepted, then a CPS plan must be in place before the [baby] can be [discharged]."  (Doc. 172-2 at 3).  At approximately 10:30 AM on February 12, 2017, the Schulkerses were permitted to take Baby AMS home under the terms of the Prevention Plan.  (*Id.* at 1).  Once Baby AMS was discharged, St. Elizabeth was no longer involved with the Schulkerses or the ongoing investigation with CHFS.

On Monday, February 13, 2017, David stayed home from work to supervise Holly around the children.  (Doc. 150 at ¶ 53).  At 9:00 AM that morning, Holly called Defendant Kammer to request she be released from the Plan.  Kammer told Holly that she had to talk to her supervisor, Defendant Campbell.  (*Id.*).  Campbell refused to release the Schulkerses from the Prevention Plan.  (*Id.*).  At that point, David and Holly decided to hire an attorney, Rene Heinrich.  (*Id.* at ¶ 54).

### D.   The In-School Interviews

Later on February 13, 2017, Kammer and another CHFS social worker went to public elementary and middle schools to interview the Schulkerses' children, BOB (age 8), BRB (age 9), EMS (age 9), and EES (age 13). No one from the Commonwealth obtained a warrant to conduct the interviews.  (Doc. 150 at ¶ 55).  Holly and David did not consent to the interviews, and they were unaware that the interviews were being conducted.  (*Id.*).  Defendant Kammer asked the children about "mommy using drugs," alcohol use, and whether

there was arguing or physical violence in the house.   (*Id.* at ¶ 56).  Plaintiffs allege that the children came home from school upset and worried that they would be "taken away" from their parents.  (*Id.* at ¶ 57).

### E.   CHFS Does Not Lift the Prevention Plan

Throughout the week, Holly's counsel requested that Campbell or Kammer issue a finding of "unsubstantiated," and close the case against the Schulkerses, given the lack of evidence of drug abuse. Each request was denied without explanation.  (Doc. 150 at ¶ 65). CHFS claims Holly was given a service appeal form when the Prevention Plan was implemented, which she could have filled out for a formal review of the Prevention Plan.  (Doc. 177 at 11). Holly denies she ever received the form.  (Doc. 198 at 21).  There is no evidence that during Holly's repeated phone calls, anyone at CHFS spoke with Holly about submitting the service appeal form.

On Thursday, February 16, 2017, at her counsel's suggestion, Holly took a hair follicle drug test. (Doc. 150 at ¶ 54).  The results of the hair follicle test were negative for any drug use, and Heinrich e-mailed those results to Campbell and Kammer on February 21, 2017.  (Doc. 177-7 at 1).

Later, on February 21, 2017, Holly's counsel e-mailed Campbell to notify her that Holly would no longer follow the restrictions of the Prevention Plan and that any further action must proceed through a court.  (*Id.* at 1-2).  Holly and Holly's

10

counsel were under the impression that until the Plan was formally lifted by CHFS, Holly was at risk that CHFS could remove all of Holly's children from her care.  (Doc. 167, Heinrich Dep. at 34:2-4).

After receiving the email from Holly's counsel, Campbell contacted her supervisor, Jessica Brown, for guidance regarding the Schulkerses' request to lift the Prevention Plan. Brown told Campbell in a phone conversation to lift the Prevention Plan. (Doc. 67-10 at 67).  Defendant Campbell then emailed the Schulkerses' attorney, "Hello, I understand and I agree with you that supervision *should* be lifted." (Doc. 177-7 at 1) (emphasis added).  However, Ms. Heinrich testified in her deposition that it was her understanding from this email that Campbell was "talking to her supervisor and kind of going up the chain and that [] was still going on."  (Doc. 167, Heinrich Dep. at 34:2-4).

Later that same day, Brown sent an e-mail to Campbell with instructions to respond to Holly's attorney and to inform her that CHFS "agree[s] that a negative hair follicle test in conjunction with the other information obtained . . . warrant[s] lifting the supervision plan at this time.  We will be reaching out to the family to update our prevention plan to reflect this change." (Doc. 53-2 at 63).  However, Campbell did not send that e-mail to Holly's counsel and did not inform the Schulkerses directly that the Prevention Plan was formally lifted.  Accordingly, the Schulkerses

11

were under the impression that the Prevention Plan was still in place.

Over the next six weeks, Holly and her counsel made repeated requests for CHFS to issue a finding of "unsubstantiated" and end its investigation into the Schulkers family.  The CHFS Defendants argue that the reason the investigation lasted so long was because the Schulkerses' attorney was out of town and did not respond to emails.  There is no evidence that during this time, CHFS attempted to contact the Schulkerses directly.  At some point during the week of March 17, 2017, Kammer contacted David's ex-wife, the biological mother of EES and EMS, and asked about the vaccination status of some of the children.  (Doc. 199 at 7).  According to Plaintiffs, Holly and David "lived in fear [CHFS] would take their children (as [it] promised to do) for their failure to follow the Prevention Plan" during that time.  (Doc. 150 at ¶ 66).

Finally, on April 7, 2017, approximately two months after Holly gave birth to Baby AMS, CHFS labeled the case "unsubstantiated."  CHFS notified the Schulkerses by letter that the case had been "unsubstantiated" and therefore the Prevention Plan was terminated.  (Doc. 177-2 at 53).

### F.   Procedural History

The Schulkerses filed this case against St. Elizabeth and the social workers at CHFS in 2017.  (Doc. 1).  After a period of limited discovery, both sets of defendants filed motions to

dismiss.  (Docs. 39; 56).  During oral argument, the Court found there were too many issues of fact that needed to be sorted through the discovery process as it related to St. Elizabeth, and therefore denied its motion.  (Doc. 73).  The Court converted the CHFS Defendants' motion to a motion for summary judgment and denied the motion due to issues of fact and held that they were not entitled to qualified immunity.  (Doc. 81).  A subsequent interlocutory appeal followed, which stayed the proceedings for both sets of defendants.  (Doc. 82).

The Sixth Circuit affirmed in-part and reversed in-part the Court's denial of qualified immunity, thus remanding the case to this Court.  (Doc. 98-1).  The Sixth Circuit affirmed the denial of qualified immunity as to the substantive and procedural due process claims but reversed and awarded qualified immunity for the Fourth Amendment claim arising from the in-school interviews. (*Id.*).  The parties have since completed discovery.  Plaintiffs filed a Third Amended Complaint in October of 2021, which is now the operative complaint in this case.

St. Elizabeth has filed a Motion for Summary Judgment as to all claims, (Doc. 174), and Plaintiff has filed a Partial Motion for Summary Judgment as it relates to St. Elizabeth as a state actor and the state law claims.  (Doc. 172).  The CHFS Defendants have renewed their Motion for Summary Judgment.  (Doc. 177).  All

13

parties have timely filed their responses and replies, and the motions are now ripe for adjudication.

### STANDARD OF LAW

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. "In determining whether there exists a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the non-moving party." *See Swallows v. Barnes & Noble Book Stores*, 128 F.3d 990, 992 (6th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

### ANALYSIS OF THE CLAIMS AGAISNT ST. ELIZABETH

### A. § 1983 Claims

Plaintiffs allege constitutional violations against St. Elizabeth pursuant to § 1983. But St. Elizabeth is a private hospital, and it is a well-settled principle that there is "a line between state action subject to Fourteenth Amendment scrutiny and private conduct (however exceptionable) that is not." *Brentwood*

14

*Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (citing *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191 (1988)).  Therefore, for Plaintiffs to succeed on a § 1983 claim brought against a private entity, they must first show that St. Elizabeth was a state actor.  *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 930 (1982).  Whether or not a private entity's conduct transformed it into a state actor is a question of law for the Court to determine.[2]  *Neuens v. City of Columbus*, 303 F.3d 667, 670 (6th Cir. 2002).

"The frequent reality that the state regulates private entities or cooperates with them does not transform private behavior into state behavior."  *Thomas v. Nationwide Children's Hosp.*, 882 F.3d 608, 612 (6th Cir. 2018) (citing *Jackson v. Metro.*

---

[2] The Sixth Circuit generally employs three tests to determine whether a private entity was a state actor: (1) the public function test; (2) the state compulsion test; and (3) the nexus test.  *Brent v. Wayne Cty. Dept. of Human Servs.*, 901 F.3d 656, 676 (6th Cir. 2018).  "The public function test requires that 'the private entity exercise powers which are traditionally exclusively reserved to the state, such as holding elections or eminent domain.'" *Lansing v. City of Memphis*, 202 F.3d 821, 828 (6th Cir. 2000) (quoting *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992)).  "The state compulsion test requires that a state exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state." *Id.* at 829 (citation and internal quotation marks omitted).  "Under the nexus test, 'the action of a private party constitutes state action when there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself.'" *Id.* at 830 (quoting *Wolotsky*, 960 F.2d at 1335).  But where there are "allegations of cooperation or concerted action between state and private actors," then the conduct is automatically elevated to state action.  *Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis*, 361 F.3d 898, 905 (6th Cir. 2004).

*Edison Co.*, 419 U.S. 345, 350 (1974)).  It is well-established that "the mere fact that a hospital is licensed by the state is insufficient to transform it into a state actor."  *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006).  Similarly, "hospitals and doctors do not become state actors merely because they comply with state statutes." *Siefert v. Hamilton Cty.*, 951 F.3d 753, 760 (6th Cir. 2020).

Specifically, Plaintiffs allege substantive and procedural due process violations as to their constitutional rights to family integrity and to Baby AMS's right to be free from seizure of her person.  (Doc. 150 at ¶¶ 82-95).  The constitutional violations that the Schulkerses complain of can best be surmised from three actions taken by St. Elizabeth: (1) reporting Holly to CHFS based on a "presumptive positive" drug screen; (2) imposing supervision restrictions on Holly as a condition to visitation and discharge;

and (3) refusing to discharge Baby AMS after her pediatrician felt it was medically safe to do so.[3]  (*Id.* at ¶ 82).

## 1. Effect of Reporting Holly to CHFS

The Schulkerses allege that St. Elizabeth was a state actor when it reported Holly Schulkers to CHFS.  Specifically, the Schulkerses contend that the Commonwealth compelled St. Elizabeth to screen and report positive drug tests.  (Doc. 150 at ¶¶ 82–83). Plaintiffs argue it was a clear violation of their constitutional rights to report Holly without confirming the results of the drug screen, and that St. Elizabeth was acting under color of state law when it chose to make the report.  (*Id.*).

This argument is illogical, and the Court cannot accept it. St. Elizabeth and its employees are required by state law to report instances of suspected drug dependency of children.  KRS § 620.030

_____

[3] At the onset, the Court notes that the Contract between the Commonwealth and St. Elizabeth did not elevate the hospital's conduct to that of state action.  First, the Contract does not establish that St. Elizabeth was performing a public function.  To qualify as a public function, "the government must have traditionally *and* exclusively performed the function." *Manhattan Comm. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1929 (2019) (emphasis in original).  St. Elizabeth was screening mothers for drugs well before the Contract was signed by the Commonwealth and Defendant.  (Doc. 174-2; Doc. 163, Cinque Dep. at 26:22–27:4). Second, the Contract does not establish that St. Elizabeth was coerced into screening and reporting mothers who were positive for opiates.  The Contract does not establish specific protocols or offer any incentives for the number of positive screens reported to the state.  (*See* Doc. 172-1).  Third, the Contract here fails to establish a "sufficiently close nexus *between the state and the challenged action*." *Marie v. Am. Red Cross*, 771 F.3d 344, 363 (6th Cir. 2014) (emphasis added).  Fourth, there is no evidence showing that St. Elizabeth "willfully participate[d] in joint action with state agents." *Am. Postal Workers Union*, 361 F.3d at 905.

states that, "Any person who knows or has reasonable cause to believe that a child is dependent, neglected, or abused shall immediately cause an oral or written report to be made . . . ." By its plain language, the reporting statute applies to *all individuals.* Therefore, St. Elizabeth's employees were merely complying with state law when it reported the Schulkerses to CHFS. Following reporting mandates does not elevate a private action to state action. *See Siefert*, F.3d at 761 ("States have a traditional and transcendent interest in protecting children within their jurisdiction from abuse.") (internal quotations omitted).

## 2. Effect of Incorporating the Prevention Plan

The Schulkerses next argue that St. Elizabeth acted in concert with the Commonwealth "by imposing supervision restrictions on Holly while she was in St. Elizabeth," which were then "incorporated into the conditions of her discharge pursuant to a Child Abuse Prevention and Treatment Act ("CAPTA") 'Plan of Care.'" (Doc. 150 at ¶ 82). This argument fails for several reasons.

First, St. Elizabeth did not impose the Prevention Plan restrictions upon Holly. It is undisputed that the Prevention Plan was imposed by the CHFS Defendants—not St. Elizabeth or any of its social workers. Plaintiffs point to an internal policy for babies born to opiate-positive mothers that states: "If a CPS report is made and accepted, then a CPS plan must be in place before the [baby] can be [discharged]." (Doc. 172-2 at 3).

18

However, the Schulkerses make no allegations that anyone at St. Elizabeth encouraged or coerced them to sign the Prevention Plan that the CHFS Defendants presented to the Schulkerses. In fact, they claim that many employees at St. Elizabeth, including Dr. Otrembiak and Holly's night nurse, thought that CHFS's imposition of the Prevention Plan was unnecessary. (*See* Doc. 150 at ¶¶ 42, 46). St. Elizabeth cannot be liable for actions it did not commit.

Second, St. Elizabeth's decision to incorporate terms from the Prevention Plan into the visitation policy and discharge plan was completely divorced from any coercive influence of the Commonwealth. CAPTA requires *states* to enact and enforce laws that require a Plan of Care for the child. The law does not require anything of private entities. 42 U.S.C. § 5106(b)(2)(iii). Indeed, the language the Schulkerses rely upon in section 1.15 of CHFS's Standard Operating Procedure belies any argument to the contrary. (Doc. 19-6). The plain language instructs CHFS officials to ensure "that an infant's discharge plan from a birth hospital is *incorporated into any prevention . . . or case plan completed for the family.*" (*Id.* at 3). On its face, this does not require a hospital to do anything, let alone incorporate a prevention plan into the discharge instructions. This is underscored by the fact that the manual prescribes "best practices" for CHFS—not hospitals licensed in Kentucky.

The Plan of Care at most indicates that St. Elizabeth sided with the Commonwealth and found CHFS's Prevention Plan relevant to Baby AMS's well-being. This private decision, however, is independent of the Commonwealth's actions, and "mere cooperation" is not enough for a finding of state action. *Marie v. American Cross*, 771 F.3d 344, 364 (6th Cir. 2014) (quoting *Lansing*, 202 F.3d at 831). Accordingly, the Court finds, as a matter of law, that St. Elizabeth's decision to incorporate the Prevention Plan into the discharge instructions was not state action.

### 3. Effect of Holding Baby AMS

St. Elizabeth further held Baby AMS even after Holly's second urine screen and umbilical cord results came back negative, claiming that it needed to observe Baby AMS for withdrawal symptoms. The Schulkerses allege this was an impermissible seizure under the Fourth Amendment. However, St. Elizabeth was a private actor and cannot be held liable for constitutional violations.

The Schulkerses rely on the Second Circuit's decision in *Kia P. v. McIntyre*, 235 F.3d 749 (2d Cir. 2000), to provide footing for their position that St. Elizabeth was coerced or compelled to delay discharging their child. In *Kia P.*, a mother was discharged from the hospital, but her newborn was held because of the child's positive drug test results. The test was later revealed to be in error and the child was medically cleared for discharge. *Id.* at 752-53. The hospital, however, postponed discharging the child

20

for an additional "day or two" until social services confirmed that discharge was appropriate. *Id.* at 753, 757. The Second Circuit held that conducting a drug test, reporting the results to authorities under state statute, and treating the child did not constitute state action. *Id.* at 756. The Second Circuit reasoned, however, that the hospital then became a state actor and "seized" the child during the extended holding period—after the evidence of abuse had been discredited and the child had been medically cleared for discharge. *Id.* at 757, 759, 762.

Plaintiffs argue the instant case is akin to *Kia P.* in that there are sufficient facts from which a jury could conclude that St. Elizabeth became a state actor when it put a hold on Baby AMS's release until CHFS approved of the release. But this argument does not match the timeline that is undisputed by both parties. St. Elizabeth was not awaiting any sort of approval by CHFS to release Baby AMS—its decision to hold Baby AMS was not influenced by CHFS at all. Unlike in *Kia P.*, the CHFS Prevention Plan was in place and incorporated into the Schulkerses' visitation and discharge plan *before* the cord and second urine tests came back negative. The CHFS Prevention Plan was signed by the Schulkerses on February 10, 2017. Dr. Otrembiak did not request the final disposition from social services to discharge Baby AMS until February 11, 2017 at 4:58 AM. (Doc. 21-2 at 8). Even more,

21

Holly's umbilical cord tests did not come back negative until 1:32 PM on February 11, 2017.  (Doc. 177-8 at 1).

To the extent Dr. Otrembiak needed a final sign-off from "social services" before he could discharge Baby AMS, Dr. Otrembiak could have only been referring to St. Elizabeth's private social work team.  St. Elizabeth did not need anything else from CHFS—it had already established a Prevention Plan, and there is no evidence that CHFS asked St. Elizabeth to hold Baby AMS pending its investigation.  Any hold beyond then was either a decision of its own medical team or its own social workers.  The decision cannot reasonably be attributed to the Commonwealth.[4]

### B. Counts IV, VII, VIII, and IX

Plaintiffs have alleged that St. Elizabeth was negligent in reporting Holly Schulkers's positive drug screen to CHFS without first confirming the results (Count IV) and that this constituted

---

[4] Plaintiffs also claim that Holly herself was seized when she was discharged but Baby AMS was not because it forced her to remain in the hospital with her baby.  (Doc. 150 at ¶ 93). It is undisputed that Holly was discharged from the hospital and Baby AMS's release was delayed, during which time Holly was permitted to visit and continue breastfeeding Baby AMS.  To the extent Holly asserts that she was "seized" within the meaning of the Fourth Amendment by virtue of having been *indirectly* compelled to remain in the hospital to continue breastfeeding, this claim fails as a matter of law because it is well established that a person may be "seized" only when her freedom of movement is terminated or restrained by a state actor using "physical force or show of authority," that is "intentionally applied." *Brendlin v. Calif.*, 551 U.S. 249, 254 (2007) (first quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991); and then quoting *Brower v. Cty. of Inyo*, 489 U.S. 593, 597 (1989) (emphasis in original)).  Holly voluntarily stayed in the room with her baby and was not "seized" within the meaning of the Fourth Amendment.  She was free to leave at any point in time.

slander, as well as negligent and intentional infliction of emotional distress (Counts VII, VIII, and IX).  The Court finds in favor of St. Elizabeth on these four counts.

The Commonwealth of Kentucky, like many states, has recognized a compelling interest in protecting children. Accordingly, Kentucky has enacted statutes that "encourage reporting by eliminating the fear of potential lawsuits." *Norton Hosp., Inc. v. Peyton*, 381 S.W.3d 286, 290 (Ky. 2012).  KRS § 620.030(1)-(2) mandates that "Any person who knows or has reasonable cause to believe that a child is dependent, neglected, or abused shall immediately cause an oral or written report to be made" to local law enforcement, state police, or CHFS.  These mandatory reporters are immune from any judicial proceeding arising from the report when: (1) the reporter acted upon actual reasonable cause of abuse or neglect, or (2) the reporter acted upon a good faith belief that the reporter had reasonable cause to believe that a child is dependent, neglected, or abused.  KRS § 620.050(1).  It is immaterial whether a reporter's good faith belief is ultimately proven incorrect.  *Norton Hosp.*, 381 S.W.3d at 293.  Immunity from suit extends to "any liability, civil or criminal, that might otherwise be incurred or imposed."  KRS § 620.050(1).

Anne Marie Davis, the St. Elizabeth employee who made the report to CHFS, had reasonable cause to report Holly to CHFS.

23

Holly Schulkers had a positive drug screen for opiates and did not have a proper prescription. Davis did not report Holly to CHFS immediately, but rather waited until she had an opportunity to discuss the results with the Schulkerses. (Doc. 161, Davis Dep. 115:8-14). When Davis spoke with the Schulkerses, Holly disclosed she took some of her daughter's prescription cough medicine. Although the record does not contain much information about Holly's ingestion of the cough syrup, the Court finds that the positive drug urinalysis, absence of a prescription, and the ingestion of unprescribed cough syrup was enough to establish reasonable cause for a report to be made to CHFS. St. Elizabeth's independent medical experts concurred that there was reasonable cause to report. (Doc. 174-10 at 5; Doc. 174-11 at 5). Thus, St. Elizabeth is immune from lawsuits that stem from the report.[5]

---

[5] The Court briefly addresses Plaintiffs' argument that immunity under KRS § 620.050 applies only to individuals and not to entire organizations, such as St. Elizabeth. *See Norton Hosp.*, 381 S.W.3d at 294 ("The immunity statutes, such as KRS 620.030, were instituted to ensure *citizens* will not be hesitant to report suspected abuse or neglect or fear of reprisal from upset and sometimes wrongly accused parents.") (emphasis added). Their argument misreads KRS § 620.050(1), which applies not just to individuals but "anyone acting . . . under KRS §§ 620.030 to 620.050." KRS § 620.030(2), which institutes mandatory reporting by social workers, states that the requirement applies to "any organization or agency for any of the above." St. Elizabeth is therefore a mandatory reporter, the same way all its employees are, and it is therefore also entitled to the immunity provided under KRS § 620.050.

## C. Count V

Plaintiffs allege in Count V that St. Elizabeth violated KRS § 214.160(6) by failing to notify Holly that her urine sample would be screened for drugs.  The Court finds that St. Elizabeth properly notified Holly about the drug screen, and therefore grants Defendant St. Elizabeth summary judgment on this claim.

Before taking a toxicology screen of a pregnant woman, hospitals are required to notify the pregnant woman of the purpose of the test.  The version of KRS § 214.160 that was in effect at the time of Baby AMS's birth stated:

> No person shall conduct or cause to be conducted any toxicological test pursuant to this section on any pregnant woman without first informing the pregnant woman of the purpose of the test.

KRS § 214.160(6) (effective through July 13 of 2018).  Holly claims that St. Elizabeth never informed her the purpose of the urinalysis.

Both parties are correct that this is an issue of whether Holly was informed, not whether she consented.  Nonetheless, consent forms can be, and often are, employed by hospitals to inform patients of the purposes of procedures.  The Supreme Court of Kentucky has held that "the existence of a signed consent form gives rise to a presumption that patients ordinarily read and take whatever other measures are necessary to understand the nature, terms and general meaning of consent."   *Hoofnel v. Segal*, 199

25

S.W.3d 147, 151 (Ky. 2006).  The Kentucky Supreme Court reasoned that "to hold otherwise would negate the legal significance of written consent forms signed by the patient and render the consent form completely unreliable." *Id.*  A signee cannot negate the contents of the signed form simply because he or she failed to read the document. *See Nu-X Ventures v. SBL, LLC*, No. 3:21-cv-354, 2021 WL 4928460, at *3 (W.D. Ky. Oct. 21, 2021) (citing *Morgan v. Mengel Co.*, 242 S.W. 860, 862 (Ky. 1922)).

Holly's signature appears on three forms explaining the purpose of the drug screen.  (Doc. 121-1 at 1, 4, 6).  The three forms are nearly identical and clearly state of the urine screen: "The purpose is to clarify potential for or possibility of fetal exposure to alcohol or drugs." (*Id*).  Holly electronically signed each one of these forms, although she claims she did not know the full extent of the forms she was signing.  (*Id.*).  But under Kentucky law, her signature on the consent form creates a presumption that she read and understood the terms contained in the form.  *See Hoofnel*, 199 S.W.3d at 151.

Holly has not presented sufficient evidence to rebut the presumption that she was given notice based on the first and second consent forms.[6]  Failing to fully read or request copies of the

---

[6] Holly has alleged that her signature was fraudulently stamped on the form she was given once she was admitted to St. Elizabeth.  The Court need not analyze the circumstances surrounding this signature, since St. Elizabeth properly gave notice elsewhere.

form does not rebut the presumption that Plaintiff read and understood the terms included in the form. Similarly, not remembering whether she signed the form is not sufficient to rebut the presumption that she read the form. *See Walker v. MDM Serv. Corp.*, 997 F. Supp. 822, 825 (W.D. Ky. Feb. 3, 1998) ("The failure to read a contract and the mere lack of knowledge of its contents do not provide a basis for invalidating an executed contract."). Accordingly, the Court finds that St. Elizabeth, as a matter of law, gave Holly Schulkers the notice required under KRS § 214.160(6).

### D. Holding of Baby AMS

In their Third Amended Complaint, Plaintiffs brought an additional claim under KRS § 620.040(5)(b).[7] Plaintiffs allege

---

[7] KRS § 413.140(1)(e) states that "an action against a physician, surgeon, dentist, or hospital licensed pursuant to KRS Chapter 216, for negligence or malpractice . . . shall be commenced within one (1) year after the cause of action accrued." Given that KRS § 620.040(5)(b) applies only to hospitals and physicians, the Court holds that the statute of limitations is one year. The Court also holds that the added claim relates back to the original complaint. When applying the relation-back standard of Fed. R. Civ. Proc. 15(c)(2), courts in the Sixth Circuit "ask whether the party asserting the statute of limitations defense had been placed on notice that he could be called to answer for the allegations in the amended pleading." *Innovation Ventures, LLC v. Custom Nutrition Lab., LLC*, 912 F.3d 316, 334 (6th Cir. 2018) (internal quotations omitted). Plaintiffs clearly alleged in their Second Amended Complaint that: "After both the 'confirming' drug test and the umbilical came back negative for drugs, Holly and David repeatedly requested Baby AMS be released from the hospital. All requests were refused." (Doc. 34 at ¶ 52). The Plaintiffs also alleged, "there was no Court Order, nor any petition filed with any Court in order to justify further sanctioning or restricting the Plaintiffs." (*Id.* at ¶ 49). Accordingly, the amended claim "relates back" and is not barred by the statute of limitations.

that Defendant St. Elizabeth violated KRS § 620.040(5) by refusing to discharge their baby after the second urine screen and umbilical cord tests came back negative.  KRS § 620.040(5) provides:

> If a child who is in a hospital or under the immediate care of a physician appears to be in imminent danger if he or she is returned to the persons having custody of him or her, the physician or hospital administrator may hold the child without court order, provided that a request is made to the court for an emergency custody order at the earliest practicable time, not to exceed seventy-two (72) hours . . . When a law enforcement officer, hospital administrator, or physician takes a child into custody without the consent of the parent . . . he or she shall provide written notice to the parent or other person stating the reasons for removal of the child.  Failure . . . to receive notice shall not, by itself, be cause for civil or criminal liability.

Plaintiffs argue that after the second urine screen and umbilical cord were negative, there was no evidence to support a finding that Baby AMS was in "imminent danger."  Thus, the continued hold of Baby AMS after the Schulkerses asked for her to be discharged was in violation of the statute.[8]

St. Elizabeth argues that it held Baby AMS for medical purposes, and therefore KRS § 620.040(5)(b) does not apply.  However, under Kentucky law, there is no difference between a

---

[8] St. Elizabeth argues that because Holly could stay in the room with the baby, and was not billed for such time, that St. Elizabeth never had custody of Baby AMS.  But custody refers to who had responsibility for and authority over Baby AMS.  *See Siefert v. Hamilton Cty.* 951 F.3d 753, 764 (6th Cir. 2020) (citing *Kottmyer*, 436 F.3d at 691).  The Schulkerses have presented evidence that they asked for St. Elizabeth to discharge Baby AMS, but that request was denied.  St. Elizabeth would not permit them to take Baby AMS home.  (Doc. 163, Cinque Dep. 28:9-22).  St. Elizabeth therefore took custody of Baby AMS.

"medical observation" and a "hold"—both are subject to the limitations of KRS § 620.040(5)(b) if the parents do not consent.[9]

The Court acknowledges that holds for children typically meet the requirements of KRS § 620.040(5)(b). For example, if parents refuse necessary medical care for their child, and the child's health may be severely harmed if they are discharged and not treated, then it can be easily said that discharging the child poses an "imminent danger." In cases where new mothers consumed drugs during pregnancy, it is understandable how a baby experiencing withdrawal symptoms would be in "imminent danger" without proper medical care, thus justifying the 72-hour hold by the hospital. Presumably to combat this danger, St. Elizabeth promulgated an internal policy providing that any baby born to a mother with a positive urine screen for opiates, but no prescription, would be monitored for withdrawal symptoms for 72 hours. (Doc. 163-1 at 53).

---

[9] St. Elizabeth focuses heavily on this argument, attempting to distinguish the different types of holds. One social worker testified in her deposition that "if there is a positive drug screen, the baby is under medical observation per protocol. A hold requires a physician's order." (Doc. 162, McCann Dep. at 25:16–18). But when parents demand that their child be released from the hospital, as the Schulkerses allege they did, the hospital does not have blanket authority to deny the parents' demand. The hospital must find that discharge poses an "imminent danger" to the baby, which would give the hospital a 72-hour grace period to refuse discharge, or it must seek a court order. Despite arguing that KRS § 620.040(5)(b) does not apply, St. Elizabeth points to no other statutory authority that it had to refuse to discharge Baby AMS. To accept St. Elizabeth's argument that it had carte blanche authority to refuse to discharge Baby AMS would completely eviscerate the informed consent doctrine and instead allow for paternalism to dictate patient care.

St. Elizabeth maintains the hold on Baby AMS satisfied the applicable standard of care and that the initial positive urine screen, even if contradicted by later negative tests, still created an "imminent danger" that necessitated the hold of Baby AMS. Specifically, St. Elizabeth has submitted uncontradicted expert testimony explaining that the hospital could not have known for sure that Baby AMS was not exposed to drugs in utero.[10]  Given the expert testimony as to the appropriate standard of care, St. Elizabeth argues that the hospital considered Baby AMS to be in imminent danger if released, and thus the hold was appropriate pursuant to KRS § 620.040(5)(b).

Plaintiffs, on the other hand, point to deposition testimony and medical charts that indicate that the hospital personnel directly involved with Baby AMS's care did not subjectively believe there was an "imminent danger" posed if they released Baby AMS. The Schulkerses allege that Dr. Gultekin was aware of the positive

---

[10] Dr. Jonathan Weeks, a board certified maternal-fetal medicine and addiction medicine specialist, explained in his affidavit that "most drugs are excreted from the urine for a relatively short duration.  Thus, false negative urine results may occur despite significant in-utero exposure. A negative umbilical cord test does not absolutely exclude the possibility of maternal drug use during pregnancy."  (Doc. 174-10 at 6). Dr. Michael Ward, a toxicological chemist, further explained in his affidavit that poppy seeds contain morphine, so if in fact this was the cause of the positive result, it was not a "false positive" but rather an accurate reporting of opiates in her system.  (Doc. 174-12 at 5).   A neonatologist, Dr. Jonathan Fanaroff, explained that babies in withdrawal may appear perfectly healthy but may develop issues with their central nervous system, meaning a 72-hour hold is the appropriate standard of care to ensure there is no need for medical intervention. (Doc. 174-11 at 5).

30

drug screen but still wanted to discharge Baby AMS with Holly. (Doc. 150 at ¶ 14; *see also* Doc. 163, Cinque Dep. at 24:5-15). The baby's medical records also indicate that on February 11, 2017, Dr. Otrembiak believed that Holly's drug test was a false positive from the consumption of poppy seeds.  He went on to state that he was planning to discharge the following day, but that he needed final disposition from social services.  (Doc. 21-2 at 8).  On February 11, 2017, Social Worker McCann made a note that although "per hospital policy, [Baby AMS] should be observed for [symptoms] of withdrawal to 72 hours," Dr. Otrembiak was flexible with discharge time "due to likely false positive." (Doc. 174-6 at 3).

Throughout Baby AMS's entire hospital stay, no physician at St. Elizabeth ordered Holly to discontinue breastfeeding Baby AMS, which they may do if it is believed the mother used drugs during pregnancy.  (Doc. 161-1 at 65).  Additionally, no one at St. Elizabeth gave the Schulkerses proper written notice explaining why Baby AMS was being held, which although not dispositive, is a factor the Court should consider.  *See* KRS § 620.040(5)(b). Finally, the deposition testimony from those directly involved in Baby AMS's care fails to articulate that any of them had genuine concerns whether Baby AMS might experience withdrawal and was therefore in "imminent danger."  Instead, they merely explain that they held Baby AMS "per hospital policy."  (*See* Doc. 161, Davis Dep. at 89:3-94:8; Doc. 162, McCann Dep. at 23:8-26:21; Doc. 163,

Cinque Dep. at 23:11–27:22; Doc. 164, Shaw Dep. at 30:8–20; Doc. 165, Malloy Dep. at 35:22–37:1).

Under the statute and according to St. Elizabeth's own internal policy, social workers and nurses do not have the authority to order a hold of a baby. (*See* KRS § 620.040(5)(b); Doc. 163-1 at 74; Doc. 163, Cinque Dep. at 27:9–22). Instead, such an order must be made by a physician or hospital administrator. *See* KRS § 620.040(5)(b). Here, it appears that the two physicians involved in the care of Baby AMS, Dr. Otrembiak and Dr. Gultekin, did not believe Baby AMS was in imminent danger. Instead, these physicians were told by social workers and nurses that the baby had to be held per hospital policy.

The finding of "imminent danger" is a medical determination. This determination cannot be made by a blanket internal hospital policy, but rather must be based on the individualized facts of every patient. An internal hospital policy like St. Elizabeth's does not supersede state law. The Schulkerses have presented triable issues of fact as to whether there was a proper finding of imminent danger and whether the hold was ordered by someone authorized by statute. These questions of fact will also determine

32

whether St. Elizabeth is entitled to the immunity provided by KRS § 620.050.[11] Thus, this claim must proceed to trial.[12]

### E. Punitive Damages

Finally, St. Elizabeth asks the Court to grant summary judgment on the punitive damages issue, arguing that Plaintiffs are unable to produce evidence showing that they acted with oppression, fraud, or malice. The Court disagrees and denies Defendant's Motion for Summary Judgment as it relates to this issue.

---

[11] The "reasonable cause" defense will depend on whether the jury believes St. Elizabeth's expert testimony that Baby AMS could still have gone through withdrawal symptoms and that the physicians at St. Elizabeth also believed this when they held Baby AMS. Similarly, a reasonable jury could find that no one at St. Elizabeth was acting in good faith. "Kentucky cases have found actors to be 'acting in good faith' when the evidence established that they *believed* they were discharging a duty the law imposed upon them." *Norton Hospitals Inc. v. Peyton,* 381 S.W.3d 286 (Ky. 2012) (citing *Roberts v. Hackney,* 59 S.W. 328 (Ky. 1900); *Richardson v. Lawhon,* 4 Ky. L. Rptr. 998 (Ky. 1883)). The depositions of St. Elizabeth's employees at no point suggest that they believed that they were honestly fulfilling their duty under KRS § 620.040(5)(b). Accordingly, a reasonable jury could find that St. Elizabeth is not entitled to immunity.

[12] St. Elizabeth also argues that it would not be liable under this statute because the Schulkerses did not sustain damages. Because this is not an intentional or negligent infliction of emotional distress claim, expert testimony is not required to establish emotional distress-related damages. *Barrios v. Elmore*, 430 F. Supp. 3d 250, 259 (W.D. Ky. Jan. 2, 2020). "Emotional distress may be proven by direct or circumstantial evidence, including the plaintiff's testimony alone." *Id.* (citing *Indiana Ins. Co. v. Demetre,* 527 S.W.3d 12 (Ky. 2017)); *see also MacGlashan v. ABS Lincs KY, Inc.*, 84 F. Supp. 3d 595, 605 (W.D. Ky. 2015) (recognizing that *Osborne v. Keeney*, 399 S.W.3d 1 (Ky. 2012) is limited to claims of NIED and IIED claims). The Schulkerses' Complaint is clear that they are seeking damages for humiliation, embarrassment, mental anguish, and other indignities. (Doc. 150).

Because Plaintiffs only survive summary judgment on one state law claim, the Court need only analyze punitive damages under Kentucky law.  Under KRS § 411.184, punitive damages are limited to situations involving oppression, fraud, or malice. The statute defines fraud as meaning an "intentional misrepresentation, deceit, or concealment of material fact known to the defendant and made with the intention of causing injury to the plaintiff."  KRS § 411.184(1)(b).  This must be proven by "clear and convincing evidence."  KRS § 411.184(2).  Further, an employer cannot be punished for the act of an employee unless the employer authorized or should have anticipated the conduct in question.  KRS § 411.184(3).

Here, St. Elizabeth promulgated an internal policy requiring that any baby born to a mother with a positive drug screen be held for 72 hours to observe signs of withdrawal.  St. Elizabeth's policy in some cases contradicts state law, which requires a more subjective finding of "imminent danger."  St. Elizabeth's policy blatantly disregards the requirements for taking custody of a minor under KRS § 620.040(5)(b) and substitutes it with its own, less stringent standard.  The hospital never provided written notice to the Schulkerses explaining why it was holding Baby AMS.  Instead, its employees just repeated that the hold was per hospital policy.  Accordingly, if a jury finds for Plaintiffs on the state law claim, it could possibly find that punitive damages are appropriate

34

because St. Elizabeth misrepresented its authority to hold Baby AMS.

The Court therefore denies, without prejudice, Defendant's Motion for Summary Judgment as it relates to punitive damages. The parties may again raise the issue at the close of evidence during trial.

### ANALYSIS FOR THE CHFS DEFENDANTS

#### A. Constitutional Violations

Plaintiffs assert violations of their Fourteenth Amendment rights to both substantive and procedural due process in the imposition of the Prevention Plan. Although the parties conducted additional discovery after the Court denied Defendants' initial Motion for Summary Judgment, the Court makes clear that nothing material was discovered that changes its previous analysis. The Court, acknowledging that the record has been completely developed, allowed Defendants to renew their Motion for Summary Judgment. However, the subsequent discovery did not reveal any materially new evidence. The Court therefore forewarns that much of the forthcoming analysis will be repetitive to its own order issued in 2019 and the decision issued by the Sixth Circuit in 2020.

#### 1. Substantive Due Process

As this Court has already articulated, due process affords individuals with protection against arbitrary governmental action,

including "the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998) (citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). Courts have likened violations of substantive due process to that of arbitrary and capricious exercise of state power.  The state action "will withstand a substantive due process attack unless it is not supportable on any rational basis or is willful and unreasoning action, without consideration and in disregard of the facts or circumstances of the case." *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1221 (6th Cir. 1992) (citations and internal quotation marks omitted).

Courts apply a two-part test when examining claims of substantive due process.  "We first 'ask whether the plaintiff has shown a deprivation of a constitutionally protected liberty interest,' then we consider 'whether the government's discretionary conduct that deprived that interest was

36

constitutionally repugnant.'"[13]  *Clark v. Stone*, 998 F.3d 287, 299 (6th Cir. 2021) (quoting *Siefert v. Hamilton Cty.*, 951 F.3d 753, 756–66 (6th Cir. 2020)).  Defendants argue that their actions did not "shock the conscience."  They point to Sixth Circuit case law which holds that "only the most egregious official conduct violates substantive due process under this standard."  *Klimik v. Kent Co. Sheriff's Dep't*, 91 F. App'x 396, 403 (6th Cir. 2004) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).

This Court has already held that the Plaintiffs have shown a deprivation of a cognizable liberty interest in the state's disruption to the parent-child relationship. The right to familial association is, however, qualified due to the balance that must be struck between a parent's rights and the compelling countervailing interest the government has in protecting children.  *Kottmyer*, 436 F.3d at 690.  This Court has already held that the CHFS investigation into the allegations of abuse and neglect did not violate the Schulkerses' substantive due process rights.  (Doc. 81

---

[13] Defendants argue that this Court applied the wrong standard in its previous Memorandum Opinion and Order by requiring only a deprivation of a liberty interest to move forward with a substantive due process claim.  But as the Sixth Circuit noted in the appeal, this circuit has been unclear on whether one or both elements is needed.  *See Schulkers v. Kammer*, 955 F.3d 520, 545 n.5 (6th Cir. 2020) (comparing *Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 640 F.3d 716, 728–29 (6th Cir. 2011) with *Siefert v. Hamilton Cty.*, 951 F.3d 753, 765 (6th Cir. 2020)).  Arguably, the standard articulated in *Clark* is more stringent.  The Court thus chooses to apply this test now to show that, even applying a more stringent standard, the CHFS Defendants' alleged conduct shocks the conscience. The Sixth Circuit has already agreed as to this point. *Schulkers*, 955 F.3d at 544 n. 5

at 14).  The Court has no reason to alter that holding now. Instead, the real issue at the heart of this case is whether the Schulkerses were coerced into signing the Prevention Plan and how its restrictions interfered with their fundamental right to rear their children.  This was affirmed by the Sixth Circuit, and this Court is bound by the law of the case doctrine.  *Westside Mothers v. Olszewski*, 454 F.3d 532, 538 (6th Cir. 2006).

Turning to the second element, the Court must determine whether the CHFS Defendants' conduct was "constitutionally repugnant."  Defendants point to the Sixth Circuit's opinion in *Siefert v. Hamilton County*, 951 F.3d 753 (6th Cir. 2020), which they argue stands for the proposition that the CHFS social workers' conduct did not "shock the conscience" and therefore there was not a substantive due process violation. In *Siefert*, Hamilton County social workers and Cincinnati Children's Hospital refused to discharge a transgender teenager from the hospital for four weeks because the parents refused to sign a prevention plan agreement. *Id.* at 767.  The Sixth Circuit held that there was no evidence that the social workers acted with "deliberately indifferent conduct that shocks the conscience." *Id.*  The panel reasoned that the social workers never acted without a governmental purpose, and therefore the government's interest in protecting children outweighed the deprivation of the parental liberty interest.  *Id.* (citing *Kottmyer*, 436 F.3d at 690).

38

Though *Siefert* was decided after this Court denied Defendants' Motion for Summary Judgment in 2019, it was published before the Sixth Circuit affirmed the denial of summary judgment on the substantive due process claim in this case. **In its *Schulkers* opinion, the Sixth Circuit considered the implications of *Siefert*. The Sixth Circuit noted that although its own case law may be unclear as to whether there must also be a showing that the government's actions shock the conscience, "that ambiguity need not be decided, primarily because the Plaintiffs have made an adequate showing that Defendants' conduct did in fact 'shock the conscience' by showing that Defendants were deliberately indifferent to their right to familial association."** *Schulkers v. Kammer*, 955 F.3d 520, 544 n.5 (6th Cir. 2020). The Sixth Circuit wrote:

> In particular, we note that Plaintiffs have presented evidence that Campbell disregarded a direct instruction from her supervisor to lift the prevention plan,[14] while Kammer knowingly and actively continued her investigation into the Schulkers [sic] for *weeks* after

---

[14] Defendants' counsel argued in their briefs and at oral argument that discovery revealed that Defendant Campbell released the Schulkerses from the Prevention Plan on February 21, 2017. (Doc. 199 at 8). Counsel misrepresents the record. The email that supposedly shows that Campbell released the Schulkerses from the Prevention Plan is inconclusive because it said "should be lifted." (Doc. 177-7 at 1). It is a question of fact whether that email effectively released the Schulkerses from the Plan. **However, the email does more conclusively show that Campbell disregarded a direct order from her supervisor. (Doc. 53-2 at 63). Her supervisor directed Campbell to communicate with the Schulkerses directly regarding the status of the Prevention Plan. Campbell never did so.** Thus, the Sixth Circuit's holding that there was enough evidence that Campbell's behavior was conscience shocking is still binding on this Court. *Westside Mothers*, 454 F.3d at 538.

> the negative test results were known and Holly's non-
> use of opiates had been confirmed, going so far as to
> contact David's ex-wife, the biological mother of E.E.S.
> and E.M.S., as part of the investigation in late March.
> Based on the totality of the circumstances—considering
> "the type of harm, the level of risk of harm occurring,
> and the time available to consider the risk of harm"—a
> reasonable juror could find that Defendants' actions
> shock the conscience as an intentional or deliberately
> indifferent abuse of power.

*Id.* (citing *Range v. Douglas*, 763 F.3d 573, 591 (6th Cir. 2014)). The Sixth Circuit also explained that there were triable issues of fact as it related to Kammer and Campbell coercing the Schulkerses into signing the Prevention Plan. *Id.* at 545.

The CHFS Defendants argue that the investigation and Prevention Plan were pursued in furtherance of a governmental interest because there was a chance that Baby AMS was exposed to opiates in utero. Defendants attempt to use the medical expert testimony now in the record to show that the positive drug screen could have meant Holly was abusing drugs. The CHFS Defendants argue that "because of how the body metabolizes opiates sequential testing does not establish a 'false positive.'" (Doc. 177 at 29). Defendant Campbell also conveyed this point in her deposition testimony, explaining that one type of drug test was not more conclusive than another. (Doc. 53, Campbell Dep. at 74:12–84:5).

But looking at the statutory authority, KRS § 600.020(1)(a)(3) specifically defines an "abused or neglected child" as one "whose health or welfare is harmed or threatened

40

with harm when his or her parent . . . [e]ngages in a *pattern of conduct* that renders the parent incapable of caring for the immediate and ongoing needs of the child including, but not limited to, parental incapacity due to alcohol and other drug abuse." *Id.* (emphasis added). In 2017, Kentucky statute defined and characterized "alcohol and other drug abuse" as a "pattern[] of use." KRS § 222.005. When a report of an abused or neglected child comes in, the Cabinet must make an "initial determination as to risk of harm and immediate safety of the child." KRS § 620.040(1)(b). The Standard of Practice form then instructs social workers to "negotiate[] a prevention plan with the family" if "the determination is made that an immediate safety threat exists." (Doc. 177-3 at 19).

The Court acknowledges the practical challenges of initially determining whether there is a "pattern" of drug use when a report is made. As the St. Elizabeth experts note, positive urine drug screens do not tell physicians much about frequency or duration of drug use, if any at all, because of the body's metabolism. (Doc. 174-10 at 6). In this situation, for example, the Cabinet knew Holly had one presumptive positive drug test and admitted to taking unprescribed cough medication, but beyond that, the Cabinet had no other evidence that Holly engaged in a pattern of drug use. The Cabinet's central intake worker found that this test result was

41

evidence of a risk of harm and thus opened an investigation.  (Doc. 67-4, Grimes Dep. 53:2-24).

The parties, even in this latest round of motions, debate whether the presumptive positive drug screen showed a pattern of use sufficient to open an investigation.  (*See* Doc. 198 at 4-5). The Court has already explained that it must balance a parent's rights and the compelling countervailing interest the government has in protecting children, and accordingly reiterates its previous finding that the initiation of the investigation itself did not violate the Schulkerses' constitutional rights.  (Doc. 81 at 14 (citing *Kottmyer*, 436 F.3d at 690)).

But just because the investigation was appropriate does not mean that the Prevention Plan was appropriate.  Where Holly had no prior history of drug use; her prenatal screens were all negative; she had no prior interaction with CHFS; her doctors believed the initial drug screen to be a false positive; and where Holly was permitted to continue breastfeeding, an initial presumptive-positive drug screen does not constitute child abuse *per se*.  *See M.E.C. v. Commonwealth*, 254 S.W.3d 846, 854 (Ky. Ct. App. 2008) (children were not abused or neglected where CHFS had not shown that the children suffered any direct, emotional, or physical injury from the parent, and the witnesses testified that the parent was a nurturing parent and that the children were well-cared for by the parent).  There was not enough evidence showing that the

42

children were in an immediate safety risk to justify the imposition of the Prevention Plan.  Accordingly, there are still triable issue of facts that will need to be resolved by a jury for both Campbell[15] and Kammer.[16]

The Court is bound by the law of the case doctrine as to the substantive due process claim.  *Westside Mothers v. Olszewski*, 454 F.3d 532, 538 (6th Cir. 2006).  The evidence produced during the final phase of discovery does not change the analysis.

### 2. Procedural Due Process

Plaintiffs have also alleged that Defendants deprived them of their procedural due process rights.  Defendants argue that the Schulkerses entered the Prevention Plan voluntarily and they were given a form by which to appeal but failed to utilize.  The Sixth Circuit has already considered the Defendants' arguments, and

---

[15] Campbell is not absolved from liability merely because she was a supervisor and not in the room when the Schulkerses signed the Prevention Plan.  The Schulkerses clearly allege that Campbell was indeed part of the coercion that led them to sign the Prevention Plan.  They allege that Campbell, over the phone, was threatening and reportedly told Holly: "Well, until this gets figured out you are no longer allowed to be around any children without the supervision of approved individuals."  (Doc. 150 at ¶ 36).  Moreover, the evidence shows that Campbell prolonged the harm by ignoring a direct order from a supervisor to send a pre-drafted email clearly lifting the Prevention Plan.  Further, she never communicated with the family directly regarding the status of the Prevention Plan.  *Schulkers*, 955 F.3d at 545.  Although Campbell disputes this, these are all quintessential questions of fact.

[16] There are also issues of fact as to Kammer's individual liability. There is evidence that she misinformed the Schulkerses as to their rights and coerced them into signing the Prevention Plan. Kammer has also failed to produce evidence that she tried to communicate with Campbell to lift the Plan once the two other confirming tests came back negative. *Schulkers*, 955 F.3d at 545.

absent the discovery of new evidence, the Court is bound by the law of the case.

In general, "procedural due process principles protect persons from deficient procedures that lead to the deprivation of cognizable liberty interests." *Pittman*, 640 F.3d at 729. Plaintiffs must show (1) that they have been deprived of a cognizable liberty interest, and (2) that such deprivation occurred without adequate procedural protections. *Id.* However, the alleged deprivation must have been the result of more than a "lack of due care." *Daniels v. Williams*, 474 U.S. 327, 333 (1986). Instead, the "conduct must be grossly negligent, deliberately indifferent, or intentional." *Howard v. Grinage*, 82 F.3d 1343, 1350 (6th Cir. 1996).

As has already been decided, Plaintiffs have sufficiently shown that Defendants' conduct deprived them of the right to family integrity and to rear their children without arbitrary government interference. The primary question is whether this deprivation occurred without adequate procedural safeguards.

The Court has held that whether the Prevention Plan was entered into by the Schulkerses voluntarily is a question of fact. *Schulkers*, 955 F.3d at 546. Additionally, the Sixth Circuit has already noted that "even if plaintiffs voluntarily consented to the imposition of the Prevention Plan, they did not remain in the 'plan voluntarily at all times.'" *Id.* (quoting *Smith*, 520 F.3d at

44

600).  Plaintiffs claim that they repeatedly asked to be removed from the Prevention Plan but were not formally removed from the restrictions until April 7, 2017.

Defendants argue that they attempted to get the Plan lifted but were delayed because the Schulkerses' attorney would not respond to emails.  **First, these emails were not newly discovered, as Defendants claim. (Doc. 199 at 8).  They were in the record well before this Court and the Sixth Circuit denied the earlier motion for summary judgment.  (Doc. 53-2 at 65–71).**  Second, this position mischaracterizes the emails between Heinrich and Campbell.  Defendant Campbell contacted Heinrich because she needed Holly to release medical information so they could "move towards closing the case."  (Doc. 177-7 at 17).  The investigation and Prevention Plan are separate issues.  **CHFS could have lifted the Prevention Plan at any point in time without the requested medical information, as evidenced by Defendant Campbell's attempt to do so via her email to Heinrich on February 21, 2017.  (*Id.* at 1).**  The law of the case binds the Court to its previous conclusion that to the extent the Schulkerses did not voluntarily agree to the Prevention Plan, that issue is left to the jury.  *Schulkers*, 955 F.3d 520 at 546.

Defendants argue that Plaintiffs could have submitted a service appeal form, and that because Holly received the form but did not utilize it, she was not denied procedural due process.

45

**First, the Sixth Circuit has already found that the "Request for Appeal of Child Abuse or Neglect Finding" was useless to Holly because there was never a finding of abuse or neglect.** *Id.* **at 547. Second, the Sixth Circuit explained that there are material facts at issue as to whether the "Service Appeals" form afforded adequate process.** *Id.* Holly denies she ever received the form. (Doc. 198 at 21; Doc. 177-11). Holly also alleges she called CHFS, Kammer, and Campbell many times trying to get the Prevention Plan lifted—clearly in an attempt to appeal. Defendants have produced no evidence that they pointed her to the "Service Appeals" form or informed her of other ways she could appeal the Prevention Plan. *Schulkers*, 955 F.3d at 547. Thus, the Court is bound by the law of the case.

Lastly, the CHFS Defendants still argue that the *Parratt-Hudson* doctrine bars Plaintiffs' procedural due process claim. The Sixth Circuit discussed this issue at length and found it did not bar the claims. This Court incorporates and adopts the Sixth Circuit's reasoning by reference and finds that the *Parratt-Hudson* doctrine does not bar Plaintiffs' procedural due process claims.[17] *Id* at 547–49.

_____

[17] Because the Sixth Circuit found that the *Parratt-Hudson* argument had been forfeited by Defendants, its subsequent analysis was *dicta*. Therefore, the Court cannot rely on the law of the case doctrine and must adopt the reasoning by reference. *See Haddad v. Alexander, Zelmanski, Danner & Fioritto*, 758 F.3d 777, 781 (6th Cir. 2014).

### 3. Qualified Immunity

Defendants argue that they are entitled to qualified immunity because the complained of actions did not violate clearly established law.  The Sixth Circuit has already held that the substantive and procedural due process violations the Schulkerses complain of were clearly established.[18]  Of the substantive due process issue, the Sixth Circuit wrote that the Schulkerses have a "well-established right 'to the companionship, care, custody and management of [their] children.'"  *Schulkers*, 955 F.3d at 541 (quoting *Lassiter*, 452 U.S. 18, 27 (1981)).  Of the procedural due process issue, the panel, while noting the factual disputes, held that Defendants were given "fair warning" that it would "be unconstitutional to interfere with Plaintiffs' right to the companionship of their children without any procedural protections and without valid consent."  *Id.* at 543.  The Court is thus bound by the law of the case.  *Westside Mothers*, 454 F.3d at 538.

### B. State Law Claims

This Court did not address the Plaintiffs' state law claims of intentional and negligent infliction of emotional distress in

---

[18] The Sixth Circuit held that Defendants were entitled to qualified immunity on the Fourth Amendment claim made for the school interviews because the rights were not clearly established at the time.  The Court is bound by the law of the case, and therefore grants the CHFS Defendants' Motion for Summary Judgment on Count III.  *See Haddad*, 758 F.3d at 781.

its previous Memorandum Opinion and Order.   The Court thus considers the issue for the first time and applies Kentucky law.[19]

Kentucky law recognizes the tort of outrage, also known as intentional infliction of emotional distress ("IIED"). *Craft v. Rice*, 671 S.W.2d 247, 249 (Ky. 1984). The Kentucky Supreme Court has adopted Section 46(1) of the Restatement (Second) of Torts, which provides that "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress . . . ." *Id.* at 251.   Kentucky law also recognizes the tort of negligent

---

[19] Defendants have argued that they are entitled to state-law qualified immunity.   "Qualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions, i.e., those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment[;] (2) in good faith; and (3) within the scope of the employee's authority." *Yanero v. Davis*, 415 S.W.3d 510, 522 (Ky. 2001). Here, there is no dispute that the CHFS Defendants' conduct was within the scope of their authority. Defendants' actions were also discretionary. "[Child abuse investigations] do have certain mandated statutory requirements as to who shall be interviewed, etc., but they also involve discretionary decisions by the case workers, just as in police investigations." *Stratton v. Commonwealth*, 182 S.W.3d 516, 521 (Ky. 2006). The decision to implement the Prevention Plan, despite unconfirmed suspicions, is naturally a discretionary function. *See id.* Once Defendants have shown *prima facie* evidence "that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff." *Yanero*, 65 S.W.3d at 523. By direct or circumstantial evidence, Plaintiffs must then establish that the discretionary act was performed in "bad faith," rather than "good faith." The same "objective reasonableness test" utilized in federal § 1983 actions, applies under Kentucky's qualified official immunity doctrine. *See id*. Given that the above analysis finds that Defendants' actions violated clearly established constitutional rights, Defendants are not entitled to state-law qualified immunity for the same reasons. *Holliday v. Leigh*, No. 2:17-cv-113, 2020 WL 3217666, at *13 (E.D. Ky. June 15, 2020).

infliction of emotional distress ("NIED"). *Osborne v. Keeney*, 399 S.W.3d 1, 6 (Ky. 2012). To prevail on a NIED claim, a plaintiff must show that he or she suffered mental stress or an emotional injury that is greater than a reasonable person could be expected to endure given the circumstances. *Id.*

Plaintiffs' claims fail on the merits because they have admitted that they cannot meet their *prima facie* burden of proof. (Doc. 198 at 22). The Kentucky Supreme Court has held that for IIED and NIED claims to succeed, a plaintiff must proffer expert medical or scientific proof. *Indiana Ins. Co. v. Demetre*, 527 S.W.3d 12, 39 (Ky. 2017) (citing *Osborne*, 339 S.W.3d at 7). Plaintiffs have admitted that they do not have such evidence to present to the Court. (Doc. 199 at 22). Accordingly, the Court dismisses Counts VII and VIII.

### C. Punitive Damages

Punitive damages are available in § 1983 actions when the defendant's conduct "is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Conduct that rises to the level of deliberate indifference necessary to establish liability under § 1983 does not necessarily rise to the level of "callous indifference" that warrants punitive damages. *See id.; Gibson v. Moskowitz*, 523 F.3d 657, 664 (6th Cir. 2008) (citing *Coleman v. Rahija*, 114 F.3d 778,

787 (8th Cir. 1997)). Thus, even where there is sufficient factual support to raise a genuine issue of material fact with respect to liability under § 1983, it does not follow that such factual support exists for an instruction on punitive damages.

However, the Court finds that there is sufficient evidence from which a reasonable jury could award punitive damages. The Court acknowledges that it declined to award punitive damages in *Holliday v. Leigh*, No. 2:17-cv-113, 2020 WL 3217666 (E.D. Ky. June 15, 2020), which also involved the imposition of a prevention plan. But here, the alleged coercion, failure to follow a direct order from a supervisor, failure to point Holly to the proper appeal procedures, and overall length of time the Prevention Plan was in place are sufficiently egregious facts that warrant a different holding. The Court therefore denies, without prejudice, Defendant's Motion for Summary Judgment as it relates to punitive damages. The parties may again raise the issue at the close of evidence during trial.

Therefore, the Court being advised,

**IT IS ORDERED** that:

1.    Plaintiffs' Motion for Partial Summary Judgment is **DENIED.** (Doc. 172).

2.    Defendant St. Elizabeth's Motion for Summary Judgment is **GRANTED IN-PART** and **DENIED IN-PART**. (Doc. 174). It

50

is **GRANTED** with respect to Counts I, II, IV, V, VII, VIII, IX, and X. It is **DENIED** with respect to Count VI. The Court holds that punitive damages may still be awarded.[20]

3.   Defendants Kammer and Campbell's Renewed Motion for Summary Judgment is **GRANTED IN-PART** and **DENIED IN-PART.** (Doc. 177). It is **GRANTED** with respect to Counts III, VII, VIII, and X. It is **DENIED** with respect to Counts I and II. The Court holds that punitive damages may still be awarded.

4.   The Court's previous order, (Doc. 202), shall be, and is hereby, **AMENDED IN-PART** to conform with this order.

5.   The final pretrial conference in this case is set for **Friday, June 24, 2022, at 1:00 PM.** A separate final pretrial conference order shall enter concurrently herewith.

6.   This case is set for a jury trial on **Monday, July 18, 2022, at 10:00 AM.**

This 23rd day of March 2022.



Signed By:

_William O. Bertelsman_

**United States District Judge**

---

[20] Punitive damages cannot be the basis for its own cause of action because they are already considered as potential damages for the other claims. *Salisbury v. Purdue Pharma, L.P.,* 166 F. Supp. 2d 546, 548, n.1 (E.D. Ky. 2001).